Filed 6/4/19 (unmodifed opinion and 5/8/19 modification order attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| MERCURY INSURANCE COMPANY et al.,<br><br>    Plaintiffs and Respondents,<br><br>        v.<br><br>RICARDO LARA, as Insurance Commissioner, etc.,<br><br>    Defendant and Appellant;<br><br>CONSUMER WATCHDOG,<br><br>    Intervener and Appellant. | G054496, G054534<br><br>(Super. Ct. No. 30-2015-00770552)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed on May 7, 2019 be modified as follows:

1. On page 3, the second sentence of the second paragraph is deleted and replaced with the following: "Because the substantial weight of the evidence supports the Commissioner's decision, remand for a new hearing would be an idle act and we therefore remand with directions for the court to deny the writ."

2. On page 9 the following is inserted as the first sentence in the second full paragraph: "In February 2004 CDI filed a Notice of Noncompliance (NNC), incorporating a substantial portion of the *Krumme* Findings."

3. On page 18, the third full sentence is deleted and replaced with the following:
"The Commissioner's finding Mercury's de facto agents charged "broker fees" while acting as Mercury's agent forecloses the court's finding."

4. On page 19, in the first line of the third full paragraph, "section 2360.0(c)" is deleted and replaced with "section 2189.3" so the sentence reads: "Acknowledging 10 CCR section 2189.3 prohibits an agent from charging a broker fee, the court opined "that does not make such a fee into a 'premium' under the rate statutes."

5. The last sentence beginning on page 27 and finishing on page 28 is deleted and replaced with the following: "In addition, Mercury points to no evidence CDI ever approved "broker fees" charged by Mercury's agents or indicated they complied with Proposition 103."

6. On page 29, in the last sentence of the second paragraph "AB 2839" is deleted and replaced with "AB 2639" so the sentence reads: "Further, the trial court did not explain how AB 2639 as adopted, and different than what Mercury proposed, in fact did resolve the matter."

7. On page 32, line four, the word "Final" is deleted so the sentence reads: "Even after affirmance of the judgment in *Krumme* and the filing of the NNC, Mercury did not abate its practices for more than four years."

The petition for rehearing is DENIED. This modification does not change the judgment.

THOMPSON, J.

WE CONCUR:

IKOLA, ACTING P. J.

GOETHALS, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MERCURY INSURANCE COMPANY et al.,<br><br>    Plaintiffs and Respondents,<br><br>        v.<br><br>RICARDO LARA, as Insurance Commissioner, etc.,<br><br>    Defendant and Appellant;<br><br>CONSUMER WATCHDOG,<br><br>    Intervener and Appellant. | G054496, G054534<br><br>(Super. Ct. No. 30-2015-00770552)<br><br>ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

The opinion filed on May 7, 2019 is modified as follows:

1. On page 1, the name of defendant and appellant is changed from "Dave Jones" to "Ricardo Lara" in the caption;

2. On page 2, the first line of the opinion stating "Defendant and appellant Dave Jones, the Insurance Commissioner of the" is deleted and the following line is inserted in its place: "Defendant and appellant Ricardo Lara, the Insurance Commissioner of the";

3. On page 2, in footnote 1, a new first sentence is inserted so the footnote reads as follows: "When this action was originally filed, Dave Jones was the California

Insurance Commissioner and the named defendant. Commissioner shall also refer to any previous insurance department commissioners when applicable."

These modifications do not change the judgment. The clerk of this court is ORDERED to serve on the parties a copy of this modification order and a copy of the modified opinion.

As these clerical errors were found prior to the posting of this published opinion, only the modified version of the opinion shall be posted by the Reporter of Decisions.

THOMPSON, J.

WE CONCUR:

IKOLA, ACTING P. J.

GOETHALS, J.

Filed 5/7/19 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MERCURY INSURANCE COMPANY et al., | G054496, G054534 |
| Plaintiffs and Respondents, | (Super. Ct. No. 30-2015-00770552) |
| v. | O P I N I O N |
| RICARDO LARA, as Insurance Commissioner, etc., | |
| Defendant and Appellant; | |
| CONSUMER WATCHDOG, | |
| Intervener and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gail Andrea Andler, Judge. Motion to strike portion of intervener's reply brief and motion for judicial notice. Motion to strike denied; motion for judicial notice granted. Judgment reversed and remanded with directions.

Xavier Becerra, Attorney General, Diane S. Shaw, Assistant Attorney General, Lisa W. Chao, Nhan T. Vu and Debbie J. Vorous, Deputy Attorneys General, for Defendant and Appellant.

Consumer Watchdog, Harvey Rosenfield, Pamela M. Pressley, Jonathan Phenix; Aitken Aitken Cohn, Wylie A. Aitken, Casey R. Johnson, Megan G. Demshki; and Arthur D. Levy for Intervener and Appellant.

Skadden, Arps, Slate, Meagher & Flom, Jason D. Russell, Hillary A. Hamilton, Kasonni M. Scales, Adam K. Lloyd; Darrel J. Hieber; Hinshaw & Culbertson and Spencer Y. Kook for Plaintiffs and Respondents.

\*          \*          \*

Defendant and appellant Dave Jones, the Insurance Commissioner of the State of California (Commissioner),[1] filed a notice of noncompliance against plaintiffs and respondents Mercury Insurance Company, Mercury Casualty Company, and California Automobile Insurance Company (collectively Mercury) alleging Mercury charged rates not approved by the California Department of Insurance (CDI) and that the rates were unfairly discriminatory in violation of Insurance Code sections 1861.01, subdivision (c) and 1861.05, subdivision (b) (all further statutory references are to this code unless otherwise stated). The allegedly unapproved rates were in the form of broker fees charged by Mercury agents, which should have been disclosed as premium. After prevailing at an administrative hearing, the Commissioner imposed civil penalties against Mercury in the sum of $27,593,550 for almost 184,000 unlawful acts.

Mercury filed a petition for writ of mandate, which the court granted, reversing the Commissioner's decision. The court found the "broker fees" were not premium because they were charged for separate services. The court also rejected the Commissioner's interpretation of the term premium under the Insurance Code and regulations. In addition, the court ruled Mercury did not have proper notice it was subject to penalties, in violation of due process, and the action was barred by laches because CDI had unduly delayed in bringing the action.

---

[1] Commissioner shall also refer to any previous insurance department commissioners when applicable.

2

Commissioner and intervener and appellant, Consumer Watchdog (CWD), appeal on several grounds. They assert the trial court did not use the proper standard of review, failed to give the Commissioner's findings a strong presumption of correctness and failed to put the burden of proof on Mercury to show the findings were against the weight of the evidence. They also argue the trial court's finding the fees were charged for separate services was precluded by collateral estoppel. In addition, they maintain Mercury received proper notice of the potential imposition of a penalty, and laches did not bar the action.

We agree with Commissioner and CWD the writ was issued in error and reverse the judgment. Because there was substantial evidence supporting the Commissioner's decision, remand for a new hearing would be an idle act and we therefore remand with directions for the court to deny the writ.

As a separate ground to affirm the judgment, Mercury argues its due process rights were violated by improper ex parte communications by the CDI, and the proceedings against it should be dismissed. We disagree. We also deny Mercury's motion to strike portions of CWD's brief on this issue.

Finally, we grant intervener's unopposed motion for judicial notice of CDI's responses to initial public comments about proposed rules concerning the interpretation of the term premium.

## BACKGROUND

In the insurance industry, business is generated by producers, either agents or brokers. (*Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 932, fn. 4 (*Krumme*).) An insurance agent is "a person authorized, by and on behalf of an insurer, to transact all classes of insurance other than life, disability, or health insurance, on behalf of an admitted insurance company." (§ 31; see § 1621.) An insurance broker is "a person who, for compensation and on behalf of another person, transacts insurance other than life, disability, or health with, but not on behalf of, an insurer." (§ 33; see § 1623.)

3

"An agent's primary duty is to represent the insurer in transactions with insurance applicants and policyholders." (*Douglas v. Fidelity National Ins. Co.* (2014) 229 Cal.App.4th 392, 410 (*Douglas*).) "In contrast, a broker's primary duty is to represent the applicant/insured, and his or her actions are not generally binding on the insurer. 'Put quite simply, insurance brokers, with no binding authority, are not agents of insurance companies, but are rather independent contractors.'" (*Id.* at p. 411, italics omitted.)

A broker may charge a fee as long as the "broker is not an appointed agent of the insurer with which the coverage is or will be placed." (Cal. Code Regs., tit. 10, § 2189.3, subd. (c).) There is no authority allowing an insurance agent to charge such a fee.

The Insurance Code has prohibited the charging of unfair premiums since 1947. (See former §§ 1852, 1861.05.) In 1980 the Commissioner promulgated Bulletin 80-6 to the insurance industry stating, "The California courts have held that all payments by the insured which are a part of the cost of insurance are premium, including any and all sums paid to an insurance agent," citing *Groves v. City of Los Angeles* (1953) 40 Cal.2d 751 (*Groves*) and *Allstate Ins. Co. v. State Board of Equal.* (1959) 169 Cal.App.2d 165.[2] It continues, "General rules of agency law prohibit an agent from charging sums not authorized by the agent's principal. Should an insurer authorize its agents to collect 'fees' such fees would have to be reported as premium by the insurer, and would, of course, have to comply with the anti-discrimination statutes. Therefore, an insurer cannot permit each of its agents to determine which fees that agent will charge because to do so would surely result in rate discrimination." Bulletin 80-6 explained it was "not a new

---

[2] We are not persuaded by the trial court's attempt to distinguish these cases on the grounds they were interpreting "gross premium for taxation purposes" only.

4

administrative construction of the law, but is a restatement of the law as it exists and as previously interpreted and applied by this office."

In November 1988 California voters enacted Proposition 103 "'"to protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance marketplace, to provide for an accountable Insurance Commissioner, and to ensure that insurance is fair, available, and affordable for all Californians.'"" (*Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 968, 981 (*Donabedian*), quoting Prop. 103, § 2 [uncodified preamble, "Purpose"], reprinted at Historical and Statutory Notes, 42E West's Ann. Ins. Code (2013 ed.) foll. § 1861.01, p. 65.)  Section 8, subdivision (a) of Proposition 103 provides it is to "'"be liberally construed and applied in order to fully promote its underlying purposes.'"" (*Donabedian,* at p. 977.)

Proposition 103 requires prior approval of insurance rates and prohibits unfairly discriminatory rates.  (§§ 1861.01, subd. (c), 1861.05, subds. (a), (b); *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 239-240 (*20th Century*).)  It "is not limited in scope to rate regulation.  It also addresses the underlying factors that may impermissibly affect rates charged by insurers and lead to insurance that is unfair, unavailable, and unaffordable." (*State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1041-1042.)

In 1995 CDI adopted a regulation defining "premium" as "the final amount charged to an insured for insurance after applying all applicable rates, factors, modifiers, credits, debits, discounts, surcharges, fees charged by the insurer and all other items which change the amount the insurer charges to the insured." (Cal. Code Regs., tit. 10, § 2360.0, subd. (c) (10 CCR § 2360.0(c)).)  In adopting this regulation, in response to public comments the Commissioner stated:  "'For purposes [of Proposition 103], a rate is the price or premium that an insurer charges its insureds for insurance,'" quoting *20th Century, supra*, 8 Cal.4th at p. 240.  He continued, the regulations "must define the term to make it clear that it is the final, total amount charged to the insured which cannot be

5

unfairly discriminatory - - and this is clearly the intent of Proposition 103 as interpreted by the unanimous California Supreme Court. Proposition 103 was not intended to allow insurers to get around the prohibition against unfairly discriminatory 'rates' by adding other unfairly discriminatory charges after a base rate is determined."

"[I]nsurance premium includes not only the 'net premium' . . . but also the direct and indirect costs associated with providing that insurance coverage and any profit or additional assessment charged." (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1325 (*Troyk*).)

## FACTS AND PROCEDURAL HISTORY[3]

Since its founding in 1962 up to 1989 Mercury sold insurance only through agents. After Proposition 103 passed in 1988, Mercury "converted" approximately 700 of its agents to "brokers" and notified the CDI their agency status was terminated.

Auto Insurance Specialists (AIS) which became Mercury's appointed agent in 1968, also entered into a "broker's contract" with Mercury in 1988 after the passage of Proposition 103. In executing the "broker's contract" AIS wrote, "we understand that the relationship between Mercury and A.I.S. is not changed in any material fashion as a result of this change in title and understand that our ability to bind coverage and other essentials of our mutual business relationship including our ability to hold ourselves out as a representative of Mercury Insurance Group is not changed by the execution of this new agreement."

---

[3] As discussed below in section 1, the proper standard of review requires trial court review of the Commissioner's findings, not merely the underlying evidence. Therefore our statement of facts is based primarily on the evidence set out on the Commissioner's findings. Mercury's recital of the facts generally did not cite to the Commissioner's findings and we disregard it to the extent it failed to correspond with the proper standard of review. Likewise, we reject Mercury's claim CDI and CWD failed to set out all material facts and thereby waived their arguments.

6

Mercury's "brokers" began charging "broker fees" on automobile insurance policies. Mercury's agents who provided the same service and coverage did not charge an extra fee.

In 1998 CDI conducted an examination of Mercury. In July 1999 CDI provided to Mercury a report (1998 Exam Report), which stated Mercury's "brokers" were actually de facto agents under section 1621. The 1998 Exam Report also stated the purported conversion to "brokers" violated at least three Insurance Code sections because 1) the "brokers" were charging fees for providing the same services as Mercury's agents (§ 1861.05, subd. (a)); 2) Mercury's advertising misrepresented that consumers were dealing with agents and failed to advise the "brokers" were charging fees (§ 790.03, subd. (b)); and 3) Mercury had not filed notices of appointment, required for agents, for the "brokers" (§ 1704, subd. (a)). The 1998 Exam Report stated the violations would be reported to CDI's legal division.

CDI met with Mercury in August 1999 and January 2000 to discuss the 1998 Exam Report. Prior to the 2000 meeting CDI sent Mercury a draft Notice of Noncompliance (Draft NNC). It stated Mercury was violating sections 1861.01 and 1861.05 by virtue of its agents charging "unapproved 'broker fees.'" It also stated Mercury was subject to civil penalties.

At the 2000 meeting, Mercury agreed to provide a response to the Draft NNC. CDI agreed once it received the response it would notify Mercury if "other action needs to be taken." Mercury never submitted a response to the Draft NNC.

Mercury then proposed legislation (Assem. Bill No. 2639 (2000 Reg. Sess.) (AB 2639)) to amend the definition of a broker under section 1623 to provide a licensed broker submitting an insurance application to an insurance company is "conclusive[ly] presume[d]" to be a broker and to allow "an insurer to authorize a broker to bind coverage" on the insurer's behalf. CDI opposed AB 2639 because it would "'blur' the long-established legal distinctions between 'agents' and 'brokers' and would create

7

confusion for the consumer and problems for . . . enforcement. . . . [F]ees are commonly non-refundable, excessive, and charged on transactions when they should be included in the premium."

The Legislature amended section 1623, but not as proposed by Mercury. Rather, it created a rebuttable presumption, for licensing purposes only, that the person is acting as an insurance broker."[4]

A few weeks after amended section 1623 was enacted, in October 2000 CDI issued an addendum to the 1998 Exam Report (2000 Addendum). Among other things the 2000 Addendum explained CDI had contacted Mercury inquiring as to the whereabouts of Mercury's promised response to the Draft NNC. It also stated "Mercury will contact CDI's Legal Division to discuss this matter further."

The next month Mercury sent a letter to CDI stating it believed passage of AB 2639 had resolved the improper broker fee issue (Mercury Letter).

In December 2000 CDI filed the final version of the 1998 Exam Report, which repeated CDI's conclusion Mercury's "broker fees" were illegal.

In the meantime in June 2000 Robert Krumme, a consumer, filed suit against Mercury[5] pursuant to Business and Professions Code section 17200 et seq. alleging Mercury's "brokers" were actually de facto agents who were charging illegal "broker fees." (*Krumme v. Mercury* (Super. Ct. S.F. City and County, 2000, No.

---

[4] The 2000 version of section 1623 provided: "Every application for insurance submitted by an insurance broker . . . shall show that the person is acting as an insurance broker. If the application shows that the person is acting as an insurance broker and is licensed as an insurance broker . . . it shall be presumed, for licensing purposes only, that the person is acting as an insurance broker." Section 1623 has since been amended by Statutes 2008, chapter, 304 (A.B.2956), section 2 and Statutes 2010, chapter, 4000 (A.B. 2782), section 7.

[5] The named defendants were Mercury Insurance Company, Mercury Casualty Company, California Automobile Insurance Company, California General Underwriters Insurance Company and American Mercury Insurance Company.

313367).)  He also alleged the "broker fees" had not been disclosed to or approved by CDI.

Following the *Krumme* trial in May 2003 the court issued lengthy findings of fact and conclusions of law (*Krumme* Findings), ruling Mercury's "brokers" were de facto agents.  It found Mercury's relationship with its "brokers" was "functionally indistinguishable" from Mercury's relationship with its agents.  It further ruled the de facto agents were charging illegal "broker fees," for which Mercury was vicariously liable.  The court issued a permanent injunction barring Mercury from selling insurance through "brokers" who were actually de facto agents and also prohibited Mercury's de facto agents from charging "broker fees."[6]

Mercury obtained a stay while it appealed the *Krumme* judgment.  In the appeal it did not challenge the *Krumme* Findings.  (*Krumme, supra*, 123 Cal.App.4th at pp. 932-933.)  Rather, it made a legal argument that brokers could be "dual agents" representing both insureds and insurers and exercising the powers under sections 1621 and 1623 without being subject to the limits set out in those statutes.  In affirming the judgment the Court of Appeal disagreed, explaining that such an interpretation would turn those statutes into "dead letters."  (*Krumme*, at p. 943.)

After the judgment became final and the stay expired, Mercury filed three motions to vacate the judgment, all of which were denied.  After *Krumme* became final in October 2004, the relationships Mercury had with its "brokers" and its agents continued to be "indistinguishable."  By about November 2005 most of Mercury's "brokers" had converted to agents.

This did not include AIS, which for the years 2002 through 2004 had collected approximately $6 million in "broker fees" and generated more than $300 million in premium annually.  As the Commissioner found, "Mercury's relationship with

_____

[6]  The court also found Mercury engaged in deceptive comparative rate advertising to compete with other insurers who did not charge broker fees.

9

AIS its largest 'broker,' remained unchanged after the *Krumme* findings." In August 2005 Mercury advised Wall Street, "We don't see our relationship with AIS changing. We are working very closely with them. They are our largest broker as you know." As of November 2005 Mercury had not made any changes required by *Krumme* as to its relationship with its "brokers." The business model with AIS acting as a Mercury "broker" continued until Mercury bought AIS in 2009.

Following the *Krumme* judgment, CDI commenced an administrative action against Mercury by filing and serving a notice of noncompliance, an accusation, and an order to show cause.[7] The Second Amended NNC (Final NNC), which sought imposition of civil penalties against Mercury, alleged Mercury charged rates not approved by the CDI, and which were unfairly discriminatory in violation of sections 1861.01, subdivision (c) and 1861.05, subdivision (b). Mercury and CDI stipulated to stay proceedings on the Final NNC pending Mercury's appeal of *Krumme*.

Prior to the administrative hearing on the Final NNC CDI filed a motion, based on collateral estoppel, to bar Mercury from relitigating several of the *Krumme* Findings, including that when Mercury's "brokers" charged "broker fees" they were "act[ing] in the course and scope of their agency in transacting insurance as 'insurance agents' on behalf of Mercury." Administrative Law Judge Michael A. Scarlett (ALJ Scarlett), assigned to hear the matter, granted the motion (Collateral Estoppel Ruling).

The administrative hearing was conducted over 15 days with more than a dozen witnesses testifying and almost 4,000 pages of exhibits admitted. The parties also filed multiple briefs on every disputed issue.

---

[7] The order to show cause alleged Mercury engaged in false advertising. Pursuant to Mercury's motion the order to show cause and the accusation were bifurcated from the hearing on the issue in this appeal regarding the unapproved and discriminatory rates.

10

ALJ Scarlett issued a 62-page proposed decision subsequently adopted by the Commissioner (Commissioner's Decision).  He found that after passage of Proposition 103, from 1989 through 2003 Mercury converted almost its entire force of insurance agents to "brokers," such that about 90 percent of its producers were "brokers."  Mercury used the same contract for the "brokers," changing only the word "agent" to "producer," defined in the contract as "broker."  After 1989 all new producers were "brokers."  Mercury's "brokers" were "indistinguishable" from Mercury's agents

The Commissioner's Decision found that once the producers became brokers they began charging "broker fees" ranging from $50 to $150.  "On rare occasions" a customer did not pay a "broker fee."  Actual agents who provided the same services and coverage did not charge any extra fees.  As a result a person obtaining a Mercury policy through a "broker" paid more than someone purchasing the same policy from an agent.

The Commissioner found Mercury's top agent, AIS, also became a "broker" and engaged in the same conduct.  AIS collected "broker fees" on more than 99 percent of the policies it obtained for Mercury.  In a five-year period between 1999 and 2004, AIS "brokers" charged almost $27.6 million in unapproved "broker fees" on behalf of Mercury in California.  "AIS continued transacting insurance on behalf of Mercury in its 'broker' status until January 1, 2009, when Mercury purchased AIS."  AIS charged "broker fees" on insurance policies on behalf of Mercury until that purchase, at which time Mercury filed a notice of appointment showing AIS as a Mercury agent.

According to the Commissioner's Decision, when filing its rate applications for approval with CDI, Mercury did not include the "broker fees" charged by its "brokers."  CDI did not approve the "broker fees" for at least the period 1989 through 2006.  Based on *Krumme*, Mercury was "collaterally estopped from contesting that the 'broker fees' were not approved by the CDI."  Further, based on the Collateral Estoppel Ruling, Mercury was estopped from arguing its "brokers" were not Mercury's de facto

11

agents.  In addition, there was sufficient evidence to rebut the presumption that Mercury's "brokers" were in fact brokers.

The Commissioner found AB 2639 "as enacted, did not provide support for Mercury's position that its 'brokers' were traditional brokers, and not de facto insurance agents acting on behalf of Mercury."

Based on the language of the rate statutes and regulations, the purpose of Proposition 103, and Bulletin 80-6, the Commissioner's Decision held the "broker fees" were premium that were required to be approved after reported on a rate application. Therefore, "from at least July 1, 1996 through 2006, Mercury violated sections 1861.01, subdivision (c), and 1861.05, subdivision (a), when it allowed its designated 'brokers' to charge and collect unapproved and unfairly discriminatory 'broker fees' to Mercury's policyholders."

The Commissioner found Mercury knew of Bulletin 80-6, which provided all fees an agent collects on behalf of an insurer are premium and must be reported. Mercury had notice since 1999 that CDI considered Mercury's conduct violated the Insurance Code and could lead to CDI filing a notice of noncompliance.  Although Mercury had actual notice of the violation, it willfully continued to charge the improper "broker fees" through the end of 2008.

The Commissioner's Decision found CDI's delay in filing the Final NNC while waiting for the conclusion of *Krumme* was a proper exercise of judicial economy and conservation of state resources and did not result in an unreasonable delay in filing the Final NNC.

The Commissioner found Mercury was subject to a penalty for each unlawful fee it charged. It imposed a penalty of $150 for each violation from September 1999 to August 2004 for a total sum of $27,593,550 for 183,957 acts.[8]

Subsequently, Mercury filed the action seeking a writ of administrative mandate under Code of Civil Procedure section 1094.5 challenging the Commissioner's Decision. Consumer Watchdog intervened in opposition to the petition. Thereafter, the court granted the petition.

In the minute order setting out the decision (Minute Order), the court did not dispute the findings in the Commissioner's Decision as to collateral estoppel, that Mercury's "brokers" were de facto agents, or that AIS "brokers" were de facto agents throughout the penalty period. It acknowledged Mercury did not dispute that AIS brokers were its de facto agents. Nevertheless, the court found the "broker fees" were not premium because charged for a separate service. It further rejected the Commissioner's interpretation of "premium" under the Insurance Code and regulations.

The court also ruled the penalty violated due process because Mercury did not have "fair notice that it could be subjected to penalties." Further, the court found CDI had "unduly delayed in issuing the NNC," giving rise to the bar of laches.

Additional facts are set out in the discussion.

## DISCUSSION

*1. Standard of Review*

Review of a decision of the Commissioner must comply with the provisions of the Code of Civil Procedure, requiring the superior court to use an independent judgment standard of review. (§ 1858.6.) Under that standard, although the court may reweigh the evidence and substitute its own findings, before doing so it must "accord a

---

[8] The maximum penalty for a willful violation is $10,000 per act. (§ 1858.07, subd. (a).) The findings noted that under that same section, the penalty for a nonwillful violation is $5,000 per violation. (*Ibid.*)

strong presumption of correctness to the Commissioner's findings." (*State Farm Mutual Automobile Ins. Co. v. Quackenbush* (1999) 77 Cal.App.4th 65, 71.) "[T]he party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angeles* (1999) 20 Cal.4th 805, 817 (*Fukuda*).)

A party challenging an agency's decision may argue there was a "prejudicial abuse of discretion" (Code Civ. Proc., § 1094.5, subd. (b)), as Mercury did here. Abuse of discretion is shown if the agency "has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid*.) "Where it is claimed that the findings are not supported by the evidence [as Mercury argued], in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence." (Code Civ. Proc., § 1094.5, subd. (c).)

"[A]buse of discretion is established not when the administrative agency's action is not supported by the weight of the evidence but rather when such agency's findings are not supported by the weight of the evidence." (*Hadley v. City of Ontario* (1974) 43 Cal.App.3d 121, 127, italics omitted.) Thus, the trial court's duty is to review the agency findings to determine if the weight of the evidence supports them.

"'"[R]arely, if ever, will a board determination be disturbed unless the petitioner is able to show a jurisdictional excess, a serious error of law, or an abuse of discretion on the facts.'"" (*Sager v. County of Yuba* (2007) 156 Cal.App.4th 1049, 1053 (*Sager*).)

Where a court exercises independent judgment, the general rule requires us to review the trial court's decision for substantial evidence. (*Fukuda, supra*, 20 Cal.4th at p. 824.) Here we are unable to do so, however, "because that court's findings are themselves infected by fundamental error." (*Ibid*.) The court did not apply the correct

14

standard of review; it failed to "accord a presumption of correctness to the administrative findings." (*Ibid*.)

In the Minute Order, the court stated it was required to use the independent judgment standard, "accord[ing] a strong presumption of correctness to the Commissioner's findings," but that it was "free to reweigh the evidence and substitute its own findings." This was correct as far as it went.

However, the court made no mention of plaintiffs' burden to show the findings in the Commissioner's Decision were not supported by the evidence. This was error. (*Sager, supra*, 156 Cal.App.4th at p. 1053 [trial court erred by failing to place burden of proof on plaintiff to show "the decision was against the weight of the evidence"].)

Further, the court paid scant if any attention to the findings in the Commissioner's Decision or whether they were supported by the weight of the evidence, in violation of its standard of review. (*San Diego Unified School Dist. v. Commission on Professional Competence* (2013) 214 Cal.App.4th 1120, 1145, 1146, 1149 [failure to consider all evidence or give proper respect to the Commissioner's "assessment of the weight of the evidence" warrants reversal].)

The Minute Order does not contain an analysis by the trial court of whether the findings in the Commissioner's Decision were contrary to the weight of the evidence or whether Mercury had rebutted the presumption of correctness. It did not reject specific evidence on which the Commissioner's Decision relied or determine the Commissioner's Decision was not supported by the weight of the evidence. Instead, it ignored the findings in the Commissioner's Decision and made its own findings in violation of the proper standard of review. This tainted the entire Minute Order and mandates reversal. (*City of Pleasanton v. Board of Administration* (2012) 211 Cal.App.4th 522, 536 [reversal where court saw "no indication the [trial] court reviewed the administrative record" by properly applying the independent judgment standard].)

15

Mercury maintains there is no law requiring the trial court to specifically state what it did to comply with the standard of review. We are not holding it was required to do so. But the sense of the ruling must reflect the analysis was done. Here the Minute Order did not do so, as we discussed.

"'[W]hether the trial court applied the correct standard of review . . . is a question of law,'" which we review de novo. (*Coastal Environmental Rights Foundation v. California Regional Water Quality Control Bd*. (2017) 12 Cal.App.5th 178, 188.) We also review de novo both questions of law and mixed questions of law and fact that are primarily legal. (*Id*. at p. 190.)

### 2. "*Broker Fees*" *as Premium*

The Commissioner's Decision held Mercury's "broker fees" were premium that were required to be approved after reported on a rate application. The trial court ruled to the contrary, finding the "broker fees" were not premium because they were charged for separate services. As discussed below, this ruling is precluded by the *Krumme* Findings, which bind Mercury pursuant to the Collateral Estoppel Ruling.

Whether "broker fees" were premium is mixed question of fact and law which we review de novo. (*20th Century, supra*, 8 Cal.4th at p. 271.)

As set out above, according to well-established law and regulations, premium includes all payments made by an insured that are part of the cost of insurance, including "all sums paid to an insurance agent." (Bulletin 80-6.) This includes "all . . . fees . . . and all other items which change the amount the insurer charges to the insured." (10 CCR § 2360.0(c).) Put another way, premium is comprised of the net premium and "the direct and indirect costs associated with providing" the insurance and "any profit or additional assessment charged." (*Troyk, supra*, 171 Cal.App.4th at p. 1325.)

We disagree with Mercury's limited interpretation of premium as including only the cost of risk and administrative expenses as inconsistent with established

16

definitions of premium.  Likewise, Mercury's claim broker fees are not premium is irrelevant.  As *Krumme* held Mercury's "brokers" were not actually brokers but were de facto agents.  Thus, the "broker fees" they charged were in fact premium that had to be reported and approved.

### a. Collateral Estoppel Effect of Krumme

The *Krumme* Findings found Mercury's "brokers" were its de facto agents, who, while acting in the course and scope of their agency on behalf of Mercury, were charging illegal "broker fees" for which Mercury was vicariously liable.  Mercury did not obtain prior approval from the Commissioner to charge or collect these "broker fees." ALJ Scarlett ruled the *Krumme* Findings bound Mercury under the collateral estoppel doctrine.  The Commissioner's Decision held that pursuant to the Collateral Estoppel Ruling Mercury was estopped from arguing its "brokers" were not de facto agents.

In the writ proceeding, Mercury did not challenge those findings nor did the court overturn them.  In fact the Minute Order specifically found Mercury did not dispute AIS brokers were its de facto agents.  Thus, Mercury cannot challenge these findings on appeal.  (K.*C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc*. (2009) 171 Cal.App.4th 939, 948.)

When the court ruled the "broker fees" were "charged for a *separate* service provided by AIS, in giving customers comparative pricing, for multiple potential insurers," it erred because it did not give collateral estoppel effect to the *Krumme* Findings that, when charging the "broker fees," Mercury's "brokers were acting and act in the course and scope of their agency in transacting insurance as 'insurance agents' on behalf of Mercury."  The court's finding directly contradicts the *Krumme* Findings that in charging the "broker fees" Mercury's "brokers" were acting on behalf of Mercury, not providing a service to customers.

In ruling the "broker fees" were not premium the court stated collateral estoppel did not apply because *Krumme* did not decide whether "broker fees" were

17

premium; rather *Krumme* stated "ratemaking was not at issue in the case." But this misses the point. The Commissioner never found *Krumme* had decided "broker fees" were premium. The Commissioner's finding Mercury charged "broker fees" while acting as Mercury's agent forecloses the court's finding. And a determination about ratemaking is not necessary for a decision in this case.

In *Krumme*, the court also found Mercury was violating the Business and Professions Code in its advertising of rate comparisons without disclosing broker fees might be added to the disclosed premium amount. (*Krumme, supra*, 123 Cal.App.4th at p. 935.) It explained the advertisements were likely to deceive customers "'because undisclosed broker fees that materially affect the cost of the insurance and adversely affect the comparison of Mercury's rates with those of the quoted competitors may be added at the time the consumer purchases Mercury insurance.'" (*Ibid*.) This finding directly conflicts with the court's finding that the "broker fees" were "not part of the cost of obtaining a policy from Mercury."

### b. *Fees for Separate Services*

The trial court found the "broker fees" were not premium because they were paid for separate services, i.e., comparative rate shopping. This was error.

First, the *Krumme* Findings, which Mercury did not challenge, determined Mercury's "brokers," i.e., its de facto agents, charged "broker fees" "in the course and scope of transacting insurance on behalf of Mercury, and therefore in the capacity of insurance agents within the meaning of section 1621 on behalf of Mercury."[9] (See *Krumme, supra*, 123 Cal.App.4th at pp. 933, 934.) They also held this was unlawful because "[t]o lawfully charge a broker fee, the broker-agent licensee must be acting in the

---

[9] We reject Mercury's assertion *Krumme* held its "brokers" were agents only once an insurance contract was in place. We found nothing in *Krumme* to support this contention.

18

capacity of an insurance broker within the meaning of section 1623," which Mercury's "brokers" were not doing. (*Ibid.*)

Second, as noted, the trial court here failed to accord the required strong presumption of correctness to the findings in the Commissioner's Decision. The Commissioner found the "broker fees" were premium, not payment for separate services. The Commissioner cited to evidence that "broker fees" were charged by Mercury's "brokers," i.e., de facto agents, in the course of their agency on behalf of Mercury. The "broker fees" were not fees charged for services on behalf of the insured. Rather, the Commissioner found, the "broker fees" are actually agent fees, which are part of premium and must be included in a rate application for prior approval.

The court's finding that "broker fees" were proper is based on an erroneous assumption the "brokers" were acting in that capacity, not as agents, as found by *Krumme*. Further, the finding that "broker fees" were for a separate service cannot be reconciled under the circumstances of the case. If the "brokers" were in fact agents acting within their agency on behalf of Mercury, they could not also have been acting as brokers and providing separate services on behalf of customers.

Acknowledging 10 CCR section 2360.0(c) prohibits an agent from charging a broker fee, the court opined "that does not make such a fee into a 'premium' under the rate statutes." There is no legal basis for such a conclusion. (*Troyk, supra*, 171 Cal.App.4th at p. 1325 [premium includes costs of providing coverage and any "additional assessment charged"].)

Further, contrary to Mercury's argument and the trial court's finding, CDI never argued all fees charged by an insurance agent are premium. Rather, the claim is fees charged by Mercury's "brokers," i.e., de facto agents billed while the agents were acting within the scope of their agency, were premium.

Moreover, the difference between an insurance broker and an insurance agent is not based on the services they render, as the court's Minute Order assumes. And

19

contrary to Mercury's argument, it does matter who was providing the alleged separate services. As set out above, the distinction is based on the principal served and to whom a duty is owed. An agent acts on behalf of and owes a duty to an insurance company (§§ 31, 1621; *Douglas, supra*, 229 Cal.App.4th at p. 410), while a broker acts on behalf of and owes the primary duty to the customer (§§ 33, 1623; *Douglas*, at p. 411).

The court made several factual findings about the fees charged for separate services, including that the comparative rate shopping benefitted consumers; the "broker fees" was negotiable or not always charged; and after AIS was converted to a "broker" it sometimes sold a policy for another insurer. But these findings are wholly inconsistent with the Commissioner's Decision, based on *Krumme*, that fees were charged as Mercury's agents while acting on behalf of Mercury. Again, the Collateral Estoppel Ruling bars relitigation of the findings, and the court erred in relying on this evidence to support its Minute Order.

### c. *Interpretation of Rate Statutes*

In reviewing whether an agency has properly interpreted a statute, although we make the final determination of its construction, we give "'"great weight and respect to the administrative construction."'" (*Association of California Ins. Companies v. Jones* (2017) 2 Cal.5th 376, 397 (*Assn.*).) In determining how much weight we give to the agency's interpretation we consider "factors relating to the agency's technical knowledge and expertise, which tend to suggest the agency has a comparative interpretive advantage over a court[,] and factors relating to the care with which the interpretation was promulgated, which tend to suggest the agency's interpretation is likely to be correct." (*Id.* at p. 390.) We also give deference to the Commissioner's rulings and bulletins (defining agent fees/broker fees) because, although not controlling on us, they "'do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 14 (*Yamaha*).) This is especially true when the agency here has

20

"technical knowledge and expertise" (*Assn.,* at p. 390) and has "thoroughly considered the issue and reached a reasonable conclusion in harmony with the [statute], long-standing administrative construction, and public policy considerations" (*Ohio Casualty Ins. Co. v. Garamendi* (2006) 137 Cal.App.4th 64, 79).

The statutes, regulations and case law all support the Commissioner's Decision the "broker fees" charged by Mercury's "brokers" were premium. Bulletin 80-6, adopted in 1980 and about which the Commissioner's Decision found Mercury was aware, advised insurers fees charged by agents were premium and had to be nondiscriminatory and reported to CDI.

The trial court rejected Bulletin 80-6, noting CDI's purported concession it was not "controlling authority." Although not specifically cited, the court presumably was relying on a statement in a 1997 letter from Jon Tomashoff (Tomashoff Letter) that stated Bulletin 80-6 "was never intended as, and has never been used by [CDI] as . . . the equivalent of a law or regulation." This analysis was flawed.

For one thing, the Tomashoff Letter was not addressed to Mercury but to a third party producer. Additionally, Bulletin 80-6 need not be "controlling authority" to give notice to insurers of CDI's position that fees charged by agents were premium. Moreover, as the Commissioner's Decision found, "Bulletin 80-6 has been generally accepted in the industry as prohibiting insurance agents from charging 'broker fees.'"

The court also relied on the Tomashoff Letter for the proposition that fees charged by agents for services "*outside* the scope of the agency" (italics added) were not considered premium. But this does not assist Mercury. The statement is consistent with Bulletin 80-6 and CDI's well-established position that fees charged by agents acting *within* the scope of their agency, including Mercury's "brokers," are premium. (*Krumme, supra*, 123 Cal.App.4th at p. 934.) In any event, a letter from a staff member cannot controvert the official policy of the CDI. (See *Yamaha, supra*, 19 Cal.4th at p. 13.) And, in addition, Bulletin 80-6 was not the only authority addressing this issue.

21

Proposition 103 requires the Commissioner's prior approval of insurance rates. (§ 1861.01, subd. (c).) And section 1861.05, subdivision (a) prohibits "unfairly discriminatory" rates. Further, under 10 CCR section 2360.0(c), premium includes "fees" and "all other items which change the amount the insurer charges to the insured."

After setting out applicable law, the Commissioner's Decision stated Mercury's "brokers," as de facto agents, collected "broker fees" while transacting insurance business on behalf of Mercury and thus the fees could not be deemed to be "traditional 'broker' [fees] for services." Rather, they had to be "deemed agent fees," which, under Bulletin 80-6 and 10 CCR section 2360.0(c), are premium and "and must be reported in a rate application for prior approval."

The trial court found 10 CCR section 2360.0(c) was not applicable based on its conclusion "broker fees" charged here were for separate services. However, as discussed above, this was error.

While acknowledging California Code of Regulations, title 10, section 2189.3 bars an appointed agent from charging a broker fee, without analysis the court makes the unsupported conclusion it "does not make such a fee into 'premium' under the rate statutes." This does not withstand scrutiny in light of the law that all sums paid to an insurance agent in transacting insurance are premium.

The court's interpretation of applicable law defeats rather than promotes the purposes of Proposition 103, and thus contravenes rules of statutory construction. (*Catholic Mutual Relief Society v. Superior Court* (2007) 42 Cal.4th 358, 372 [court's construction must promote purpose of statute; construction should not "lead to unreasonable, impractical or arbitrary results"].) The court's interpretation would lead to the absurd result of eviscerating the rate statutes' requirements by allowing insurance company agents to charge "broker fees" without any CDI oversight or approval. That would mean insurance agents could charge unapproved and unfairly discriminatory fees

22

for alleged separate services that would increase consumers' cost of insurance. This is contrary to the voters' intent as expressed in Proposition 103.

In addition, the court failed to give the longstanding interpretations of statutes and regulations the deference to which they are entitled. (*Yamaha, supra*, 19 Cal.4th at pp. 12, 14.) *Yamaha* set out factors as to when deference is appropriate, including when: "'the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended or entwined with issues of fact, policy, and discretion'"; and "the agency 'has consistently maintained the interpretation in question, especially if [it] is long-standing.'" (*Id*. at pp. 12-13.)

While courts are not bound by the Commissioner's interpretation of rate statutes (*Automotive Funding Group, Inc. v. Garamendi* (2003) 114 Cal.App.4th 846, 851), we do give ""'great weight and respect to the administrative construction'""" (*Assn., supra*, 2 Cal.5th at p. 397). Although the trial court never challenged the Commissioner's expertise, it did not accord his construction the deference to which it was entitled.

Finally, the court did not comply with Proposition 103 itself, which requires liberal construction "'to fully promote its underlying purposes,'" "'to protect consumers from arbitrary insurance rates and practices . . . , and to ensure that insurance is fair, available, and affordable for all Californians.'" (*Donabedian, supra*, 116 Cal.App.4th at p. 981.)

### d. Installment Payments Cases

In ruling the "broker fees" were not premium the trial court relied on *In re Ins. Installment Fee Cases* (2012) 211 Cal.App.4th 1395 (*Installment Fee Cases*) and *Interinsurance Exchange of the Automobile Club v. Superior Court* (2007) 148 Cal.App.4th 1218 (*Auto Club*). However, they do not support its conclusion.

23

In *Auto Club*, the court considered as a question of first impression whether "premium" as used in section 381, subdivision (f)[10] included fees charged for paying annual premiums in monthly installments. It held the installment fees were "interest for the time value of money and the plain and ordinary meaning of the term 'premium' as used in section 381, subdivision (f) does *not* include interest charged for the time value of money." (*Auto Club, supra*, 148 Cal.App.4th at p. 1230.)

In *Installment Fee Cases*, policyholders who paid premiums in monthly installments were charged interest. The court held this was not premium under section 381 because it was "consideration for a benefit separate from the insurance and is paid under an agreement separate from the policy." (*Installment Fee Cases, supra*, 211 Cal.App.4th at p. 1408.)

These two cases differ from the instant case for several reasons. First, the fees were optional based on the policyholders' choice to pay in a lump sum or over time. In our case, there is no evidence any customer had an opportunity to avoid the fee. Second, in the cited cases only those who paid the fee received the benefit of installment payments. In the current case, however, customers paid $50, $100, or $150 for the same policies as those sold by agents who did not charge a fee.

In *Troyk, supra*, 171 Cal.App.4th 1305, the same court that decided *Auto Club* emphasized the limitations of its holding, and by extension that of *Installment Fee Cases*. In *Troyk* the defendant insurance company offered six-month and one-month policies. Customers choosing a one-month policy were required to pay a service charge to a third-party. The court found this fee was premium (*id.* at p. 1326), explaining that "insurance premium includes not only the 'net premium' . . . but also the direct and

---

[10] Section 381, subdivision (f) states: "A policy shall specify: [¶] . . . [¶] Either: [¶] (1) A statement of the premium, or [¶] (2) If the insurance is of a character where the exact premium is only determinable upon the termination of the contract, a statement of the basis and rates upon which the final premium is to be determined and paid."

24

indirect costs associated with providing that insurance coverage and any profit or additional assessment charged" (*id*. at p. 1325).

The trial court here attempted to distinguish *Troyk*, noting Mercury did not require its "brokers" to charge a broker fee and did not collect them. But *Troyk* emphasized premium had to be examined "from the *insureds'* perspective." (*Troyk, supra*, 1711 Cal.App.4th at p. 1324.) And, the Commissioner found, based on uncontroverted evidence, Mercury's AIS "brokers" collected a fee from approximately 99 percent of its customers. "Other than the rare exceptions where the 'broker fee' was waived, the customer was required to pay the 'broker fee' as part of the cost of obtaining insurance coverage."

Further, the trial court's ruling conflicts with *Krumme*, which held Mercury was "'deemed by operation of law to have constructively received the "broker fees."'" (*Krumme*, *supra*, 123 Cal.App.4th at p. 935.) The Collateral Estoppel Ruling prohibited Mercury from relitigating this issue.

*3. Penalties*

The Commissioner has broad discretion to impose penalties for an insurer's violation of rate statutes. (*Szmaciarz v. State Personnel Board* (1978) 79 Cal.App.3d 904, 921; §§ 1858.07, 1858.3.) Penalties may not be disturbed unless there is "'"an arbitrary, capricious or patently abusive exercise of discretion'"" by the administrative agency." (*Cassidy v. California Bd. of Accountancy* (2013) 220 Cal.App.4th 620, 627-628.) "[N]either a trial court nor an appellate court is free to substitute its own discretion as to the matter." (*Cadilla v. Bd. of Medical Examiners* (1972) 26 Cal.App.3d 961, 966.) There is no abuse of discretion if the weight of the evidence supports the Commissioner's findings. (§ 1858.6) "[W]e review de novo whether the agency's imposition of a particular penalty on the petitioner constituted an abuse of discretion by the agency." (*Cassidy,* at p. 627.)

25

Under section 1858.07, subdivision (a), the Commissioner may impose a penalty up to $5,000 for each act violating Proposition 103 and up to $10,000 if the act was willful. The Commissioner found Mercury's failure to obtain prior approval for the "broker fees" was a willful violation of rate statutes for the period "from at least 1996 through 2006." Nevertheless it imposed a penalty of only $150 per violation from September 1999 to August 2004.

The Minute Order did not find the Commissioner abused his discretion defining collection of broker fees as an illegal act or calculation of the penalty. Rather, it held imposition of the fees violated due process because "Mercury was not given fair notice that it could be subjected to penalties for not treating AIS' broker fees as premium" before CDI issued the Final NNC in 2004. The Minute Order also ruled CDI "unduly delayed in issuing the [Final] NNC," thereby allowing penalties to accrue. These rulings were error.

*a. Fair Notice*

In support of its ruling Mercury was not given fair notice of the penalties, the court relied on *FCC v. Fox Television Stations, Inc.* (2012) 567 U.S. 239 (*Fox*). But *Fox* is inapt.

In *Fox* the Federal Communications Commission (FCC) changed its enforcement policy of 18 U.S.C. section 1464, which prohibits the broadcast of "'any obscene, indecent, or profane language.'" (*Fox, supra*, 567 U.S. at p. 243.) It then sought to impose penalties by applying the new policy to broadcasts occurring before the change. (*Id*. at p. 249.) The Supreme Court ruled the penalties must be set aside because the FCC failed to give fair notice before the broadcasts at issue. (*Id*. at p. 258.)

Likewise, in *Christopher v. SmithKline Beecham Corp*. (2012) 567 U.S. 142 the agency sought to impose a new interpretation of of a regulation after the conduct at issue. (*Id*. at pp. 155-156.) In addition, in *Christopher*, the court noted the agency did

26

not even "suggest[]" the defendant's conduct was unlawful. (*Christopher*, at p. 157.) Such is not the case here.

In our case there was no policy change. Rather, at all applicable times section 1861.01, subdivision (c) specifically barred charging unapproved rates and section 1861.05, subdivision (a) likewise prohibited unfairly discriminatory rates. The Commissioner's Decision found Mercury did not dispute that. Further, as stated above, at all relevant times section 1858.07, subdivision (a) expressly authorized the Commissioner to impose penalties.

In addition in 1980 CDI promulgated Bulletin 80-6, which stated all payments made by an insured, including fees, are premium, which must be reported to CDI as such and are governed by antidiscrimination statutes. The Commissioner's Decision found Mercury knew of Bulletin 80-6. This finding is uncontroverted, and it was uncontested by the trial court.

Further, the Commissioner found CDI "consistently advised" Mercury the conduct of Mercury's "brokers" charging "broker fees" was a violation of the rate statutes subjecting Mercury to penalties. It found Mercury was on notice as early as February 1999 when CDI sent the 1998 Exam Report to Mercury. It found Mercury also had notice from the Draft NNC sent to Mercury in January 2000, where CDI stated the "brokers" were not acting consistent with the definition of a broker; all payments by an insured which are part of the cost of insurance, including payments to an agent, are premium; and fees the "brokers" were charging "were not part of an approved rate application" as required by the Insurance Code

Additional notice was given during "frequent communications" between CDI and Mercury about the Exam Report and the Draft NNC between August 1999 and October 2000; from the filing of the 1998 Exam Report in December 2000; and from the filing of *Krumme*, and rendering of the *Krumme* opinion. In addition, Mercury points to

no evidence CDI ever approved Mercury's "broker fees" or indicated they complied with Proposition 103. None of these findings were contested in the Minute Order.

Instead, the court found the law "generally [was] unclear" before the Draft NNC was issued. It based this on statements in the 1997 Tomashoff Letter that "fees could be charged by agents that would not be deemed premium if provided for services outside the scope of the agency." This does not contradict CDI's position because the "broker fees" at issue were not actually broker fees but were charged by Mercury's de facto agents acting within the scope of their agency for Mercury, and thus were premium.

Further, the Commissioner found the Tomashoff Letter was not sent to Mercury nor was it addressing Mercury's practices. Moreover, even if Mercury initially could have relied on the Tomashoff Letter, it could not continue to do so after CDI sent the 1998 Exam Report in February 1999. The court failed to address this finding.

The court also apparently relied on a statement made by Tomashoff in a 1999 public hearing that the distinction between a broker and an agent was sometimes ambiguous. But as the Commissioner found, this was a general statement, not made to or about Mercury. In fact, there is no evidence Mercury attended the meeting or knew of the comments. Further, although there might sometimes be ambiguity, there was no ambiguity under the specific facts of this case. And in any event Mercury cannot claim to rely on statements made in 1997 and 1999 after receiving notice at least three times in 2000 that its conduct was violating the statute and subjecting it to penalties.

In addition, as the Commissioner found, in September 1999 Mercury published a bulletin to its producers, which stated, "We believe that the Insurance Department may take the position that all Mercury and Cal Auto producers are acting as agents and represent the company even if the producer's contract is a broker contract. . . . Under these proposed regulations no broker fee could be charged on any Mercury or Cal Auto personal lines business." Therefore, its own bulletin confirms Mercury knew there was an issue about its practices.

28

Mercury relies on the trial court's factual findings to support its argument it did not have fair notice. But as discussed above, in making the findings, the court did not give the proper weight to the findings in the Commissioner's Decision. Consequently, the trial court's findings do not withstand scrutiny.

First, the trial court pointed out that CDI did not respond to the Mercury Letter sent in November 2000 in which Mercury stated it believed AB 2639 had resolved the improper "broker fees" issue. But the Commissioner's Decision specifically rejected this claim, stating, "Given CDI's opposition to A.B. 2639, and the language in the final version of the bill that was enacted, Mercury cannot reasonably assert that it believed A.B. 2639 resolved the issues in CDI's 1998 Exam Report and Draft Notice." Further, the trial court did not explain how AB 2839 as adopted, and different than what Mercury proposed, in fact did resolve the matter.

Additionally, only a few weeks after the Mercury Letter was sent, CDI issued the final version of the 1998 Exam Report reiterating that Mercury's practices were unlawful. The Commissioner found this "further placed Mercury on notice that CDI did not consider" the issue was resolved and Mercury's assertion it believed AB 2639 had resolved the issue was "disingenuous." Although the trial court may "substitute its own credibility determinations," "it cannot ignore its statutory obligation to defer to the Commission's considered credibility findings in doing so. In our view, the superior court's decision—which is silent as to the Commission's thoughtful reasoning and analysis as to the witnesses' credibility—did not afford the respect due those findings." (*San Diego Unified School Dist. v. Commission on Professional Competence, supra*, 214 Cal.App.4th at p. 1148.)

Further, CDI filed briefs in 2003 and 2004 in *Krumme*, opposing Mercury's position.

The Minute Order also found a 2002 exam report did not mention the "broker fees" issue. It failed to note or dispute, however, the Commissioner's finding the

issue had already been referred to the legal division for enforcement. In addition, the 2002 exam report stated, "Failure to identify, comment on, or criticize non-compliant activities does not constitute acceptance of such activities." Further, the Final NNC was filed six weeks before the 2002 exam report issued. Subsequent silence in the 2002 exam report cannot disaffirm that prior notice.

Finally, the Minute Order relied on CDI's approval of Mercury's rate applications, which did not include "broker fees." But the Commissioner found the applications were incomplete and "Mercury cannot assert that it relied on CDI's approval of its rate applications to conclude that its designated 'broker's' 'broker fees' were not unlawful when the 'broker fees' were actually omitted and never approved by CDI."

Mercury argues section 1858.07, subdivision (b), a safe harbor statute, should apply. It prohibits imposition of a penalty where the Commissioner has approved a rate. The trial court correctly ruled this statute did not apply because Mercury did not provide complete information. We are not persuaded by Mercury's claim CDI did not charge it with providing false information. The weight of the evidence controverts Mercury's claim it should be afforded safe harbor protection because it "had no idea" it should have included "broker fees" in its rate applications.

Neither *MacKay v. Superior Court* (2010) 188 Cal.App.4th 1427 nor *Walker v. Allstate Indemnity Co.* (2000) 77 Cal.App.4th 750, on which Mercury relies, apply. They hold that a subsequent court action cannot be brought to challenge rates disclosed in a rate application and approved.

Thus, the substantial weight of the evidence and the Commissioner's unchallenged findings show Mercury had fair notice it could be subject to penalties.

*b. No Undue Delay*

Relying on *Walsh v. Kirby* (1974) 13 Cal.3d 95 (*Walsh*), the trial court also found imposition of penalties on Mercury violated due process because CDI "unduly

30

delayed in issuing the NNC while potentially vast penalties accrued." But *Walsh* is distinguishable.

In *Walsh*, the defendant agency collected evidence of multiple statutory violations by a regulated business without ever giving notice to the business of the violations. It then filed an action seeking cumulative penalties. The court ruled the agency had acted arbitrarily and violated the business's due process, and set aside the penalty. (*Walsh, supra*, 13 Cal.3d at p. 104.) "A departmental practice whereby notice given in a timely manner is withheld while the licensee is afforded an opportunity to engage in a series of violations thus defeats the very purposes of the [statute]." (*Ibid*.) But the court did "not express any view whether departmental conduct similar to that in the instant case would be arbitrary if exercised against a licensee who, the record would show, was an habitual offender and unwilling to conform." (*Id*. at p. 105, fn. 14.)

The Commissioner's Decision distinguished *Walsh*, finding "CDI does not have a practice of delaying the filing of an NNC to accumulate penalties. In fact, the delay in this noncompliance proceeding was due to discussions in an attempt to resolve the issues in the Draft Notice, which placed Mercury on notice of its violations, and CDI's decision to issue the [Final] NNC after conclusion of the *Krumme* litigation, neither of which involved a concerted effort or practice by the CDI to intentionally allow the accumulation of penalties without notice."

The Commissioner also found "CDI's decision to delay filing the [Final] NNC until after the *Krumme* case involved considerations of judicial economy and conserving State resources by avoiding the necessity to fully litigate issues in the [Final] NNC, that were currently being adjudicated against Mercury in the *Krumme* case." Thus, it found, the delay in filing the Final NNC was not a prejudicial delay allowing penalties to accumulate.

Further, as shown by the Commissioner's Decision, CDI gave Mercury notice of its violation on numerous occasions and Mercury showed no inclination to

31

change its conduct to comply with the statute. Thus, *Walsh* does not apply. (*Coe v. City of San Diego* (2016) 3 Cal.App.5th 772, 786 [plaintiff "repeatedly warned . . . of the violations . . . and of her need to take corrective action"].) Even after affirmance of the judgment in *Krumme* and the filing of the Final NNC, Mercury did not abate its practices for more than four years. Whether that was willful conduct or a calculated gamble by Mercury does not matter. The important thing is Mercury knew and could and should have modified its conduct.

This case is comparable to *City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302 where the court held imposition of a cumulative penalty over a two-year period did not violate due process because the defendants "had control over this time period yet allowed the penalties to accumulate." (*Id.* at p. 1316.) "[D]espite warning and extensions of the correction or abatement periods, defendants delayed[ and], failed to respond," "had their own intransigence to blame," and "had it within their control first to prevent and then to stop the accumulation of penalties." (*Ibid.*)

There was no undue delay by CDI.

*c. Other Provisions of the Minute Order*

The trial court noted specific intent, required to prove willfulness (§ 1858.5), had not been proven. This is irrelevant. Under section 1858.07, subdivision (a), a penalty may be imposed for nonwillful violations.

Likewise, the court's finding that assessing a penalty of $5,000 to $10,000 per act, as allowed by section 1858.07, subdivision (a), would be an abuse of discretion is incorrect. First, as the court acknowledged and as supported by case law, CDI has discretion to determine that each time Mercury "brokers" charged a "broker fee" could constitute an "act" subject to penalty. The fact potential penalties could be high, as the court seemed to imply, does not show abuse of discretion. Given the per act penalties, the statute plainly anticipates a large penalty could be imposed. In addition, this finding has no bearing on the facts at hand. CDI imposed a penalty of only $150 per act.

32

Imposition of the penalty did not violate due process.

*4. Laches*

A party claiming laches must prove both unreasonable delay and prejudice. (*Clary v. City of Crescent City* (2017) 11 Cal.App.5th 274, 286.)  Citing *Gates v. Dept. of Motor Vehicles* (1979) 94 Cal.App.3d 921, 925, the trial court ruled laches barred the administrative action.  It stated CDI unreasonably delayed in filing the Final NNC from at least late 2000 to early 2004.  It also found Mercury was prejudiced based on accrual of potential penalties and assessment of the actual penalty.  This was error for several reasons.

First, the Commissioner found there was no unreasonable delay in filing the Final NNC because CDI consistently maintained and repeatedly advised Mercury the "broker fees" violated the rate statutes.  Further, the Commissioner acknowledged CDI's delay was to conserve judicial resources and avoid the possibility of conflicting decisions.  "'[D]elay in reliance on legal advice, awaiting determination of a legal issue in another pending case, may be excusable.'"  (*Hill v. Hattrem* (1981) 117 Cal.App.3d 569, 573-574.)

The Commissioner also found there was insufficient evidence to show CDI unreasonably delayed in filing the Final NNC.  The court failed to consider or refute these findings nor did it cite to any evidence, other than the time period itself,[11] to support its finding the delay was unreasonable.

Cases cited by Mercury do not change the analysis.  In *Vernon Fire Fighters Assn. v. City of Vernon* (1986) 178 Cal.App.3d 710, 721-722 and *Magic Kitchen LLC v. Good Things Internat. Ltd.* (2007) 153 Cal.App.4th 1144, 1161 (*Magic Kitchen*), there was no evidence the plaintiffs' actions were related to the other actions.

---

[11] Nor did the court mention Mercury and CDI stipulated to stay Final NNC proceedings pending Mercury's appeal of *Krumme*.

33

Second, there is no evidence of prejudice. Prejudice is not presumed. (*Green v. Board of Dental Examiners* (1996) 47 Cal.App.4th 786, 792.) The only support for the court's finding Mercury was prejudiced was the accrual and subsequent imposition of penalties. It cited to no evidence of cognizable prejudice and the record contains none. Instead, the Commissioner's Decision stated there was insufficient evidence Mercury was prejudiced by the filing of the Final NNC in February 2004.

Further, as discussed above, Mercury had notice for years of its potential for imposition of penalties and deliberately chose not to modify its conduct. (See *Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 986 [court rejects the plaintiff's argument delay prejudicial because it would have changed its practice; no evidence to support it]; *California Western School of Law v. California Western University* (1981) 125 Cal.App.3d 1002, 1007 ["'If the defendant continues his act, after due warning, he does so at his own risk'"].)

Moreover, the element of prejudice requires a change of position that would not have occurred absent the delay. (*Magic Kitchen, supra*, 153 Cal.App.4th at p. 1161.) The record contains no evidence Mercury changed its position due to an alleged delay. As discussed above, the evidence is to the contrary.

As Mercury acknowledged in the administrative hearing, there is no statute of limitations for noncompliance proceedings. "By focusing solely on the passage of time, and not on the issue of disadvantage and prejudice, a court risks imposing a de facto—and impermissible—statute of limitations in a situation where the Legislature chose not to create a limitation on actions." (*Fahmy v. Medical Bd. of California* (1995) 38 Cal.App.4th 810, 816.) "There is without a doubt a realization on the part of the Legislature that administrative agencies . . . take action for the public welfare rather than for their own financial gain, and should not be hampered by time limits in the execution of their duty to take protective remedial action." (*Ibid*. [noting courts have allowed "[e]ven inordinately long delays"].)

34

Third, even assuming Mercury showed both unreasonable delay and prejudice, the court did not acknowledge or apply the higher laches standard that applies to governmental entities.[12] If laches is raised as a defense against a government entity, it "'is not available where it would nullify an important policy adopted for the benefit of the public.'" (*Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 263 [agency's delay of 26 years not barred]; *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 316 [laches not available against government agency if it would "'defeat the effective operation of a policy adopted to protect the public'"].)

Here, Proposition 103 embodies a strong public policy to "'"protect consumers from arbitrary insurance rates and practices . . . to ensure that insurance is fair, available, and affordable for all Californians."'" (*Donabedian, supra*, 116 Cal.App.4th at p. 981.) Mercury has not sustained its burden to show any exceptional circumstances supporting its position that barring the action based on delay in commencing the suit outweighs the protection of the critical public policy.

### 5. *Due Process – First Administrative Hearing*

Mercury seeks affirmance of the judgment on a wholly separate argument rejected by the trial court. During the administrative proceedings a dispute arose as to the requirements of California Code of Regulations, title 10, former section 2614.13 (10 CCR § 2614.13) dealing with "prepared direct testimony" (PDT) of witnesses,[13] which required testimony to be in writing and submitted 40 business days before the hearing. CDI and CWD argued the regulation did not apply to adverse witnesses. The

---

[12] We reject Mercury's speculative argument the trial court would not have found "manifest injustice" unless it was weighing such injustice against the public interest.

[13] These facts are taken *from Mercury Insurance Co. v. Jones* (Apr. 26, 2013, B244204) [nonpub. opn.] (*Mercury 1*).

35

Administrative Law Judge, Steven C. Owyang (ALJ Owyang), ruled to the contrary. (*Mercury 1*, at p. 1.) ALJ Owyang refused CDI and CWD's request to certify the question of whether former 10 CCR section 2614.13 applied to adverse witnesses. (*Mercury 1,* at p. 2.)

Subsequently the Commissioner (at the time Steve Poizner) issued a notice of a proposed change to 10 CCR section 2614.13 making it applicable to only party-affiliated witnesses or their experts. (*Mercury 1*, at p. 1.) Mercury filed comments and spoke at the hearing in opposition to the rule change. After 10 CCR section 2614.13 was amended as proposed, ALJ Owyang ruled the amended regulation would not apply in the hearing. He also ordered CDI's general counsel, Adam M. Cole, to disclose any ex parte communications between the Commissioner and the CDI about the rule change. (*Mercury 1*, at p. 2.) Cole disclosed that he had initiated the rule change to fix what CDI believed was an erroneous interpretation of former 10 CCR section 2614.13 and spoke with former Commissioner Poizner's chief of staff and special counsel about it. (*Mercury 1,* at p. 2)

ALJ Owyang then issued a proposed decision to dismiss the administrative proceeding for several reasons, including that the ex parte communications between the CDI and the Commissioner's office violated due process. The Commissioner rejected the recommendation (*Mercury 1*, at p. 2) and ordered a hearing on the merits. Mercury filed a writ petition to require the Commissioner to adopt the proposed decision. (*Mercury 1*, at p. 1.) When Mercury appealed the trial court's order sustaining a demurrer without leave to amend, the court of appeal affirmed. (*Mercury 1*, at p. 8.)

The administrative proceeding was then assigned to ALJ Scarlett. He ruled former 10 CCR section 2614.13 would apply but if PDT's for adverse witnesses could not be obtained, after unsigned PDT's for those witnesses were served on the opposing party, those witnesses could be subpoenaed to testify.

36

The issue was litigated at the administrative hearing and ALJ Scarlett found the ex parte communications did not violate due process and Commissioner Poizner was no longer in office, thereby effectively disqualifying the decisions maker. Further, Mercury had a full hearing.

When Mercury raised this issue in the writ proceeding, the trial court rejected Mercury's claim the proceeding should be dismissed, finding Mercury had received a fair hearing. It further found no evidence Commissioner Jones was a party to any improper communications.

Mercury again argues in this appeal that the only remedy for the due process violations is dismissal.[14] We disagree.

Cases on which Mercury relies are distinguishable. In *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd*. (2006) 40 Cal.4th 1, which Mercury cites for the proposition that reversal is "required" where an agency communicates ex parte with the decision maker and violates the separation of rulemaking and adjudicative functions, the communication was on the merits after a full hearing was completed. (*Id*. at pp. 8, 10-11, 15-16.) Here, the communications took place before the hearing and did not address the merits.

Likewise, in *Utica Packing Company v. Block* (6th Cir. 1986) 781 F.2d 71 the disputed actions occurred after a hearing on the merits when the agency secretary sought to replace the original judicial officer to have a better chance to prevail on a motion for reconsideration. Nothing comparable occurred here.

We also reject Mercury's argument the hearing in front of ALJ Scarlett was tainted. Mercury complains ALJ Scarlett deviated from ALJ Owyang's ruling because he

---

[14] Although Mercury did not file a cross-appeal raising this issue we may consider it. Pursuant to Code of Civil Procedure section 906, a respondent may "assert[] an alternate legal theory upon which the judgment may be affirmed, notwithstanding the court's resolution of the appellant's contentions in the appellant's favor." (*Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 585, 586.)

allowed adverse witnesses to testify pursuant to subpoena. But ALJ Owyang never ruled out the possibility of allowing noncooperating witnesses to testify. Further, Mercury cites no authority that ALJ Scarlett was required to follow ALJ Owyang's procedural decision.

The fact the Commissioner rejected ALJ's Owyang's proposed order and adopted the proposed decision of ALJ Scarlett does not show the hearing was unfair. The trial court did not agree with Mercury's contention that Commissioner Jones was "infected" because he retained Commissioner Poizner's prosecutors and senior advisors, noting there was no evidence. Mercury does not cite to any evidence in the respondent's brief either. There is no basis to dismiss the proceedings against Mercury.

Mercury filed a motion to strike a portion of CWD's reply brief addressing this issue, claiming CWD did not properly explain the decision in *Mercury 1* and failed to disclose the findings of the trial court here, which, Mercury claims, rejected CWD's argument. We deny the motion.

We do not decide the substance of Mercury's motion but note we did not rely on any improper or incomplete argument in CWD's reply brief. Our summary of the facts was taken from *Mercury 1*, and our analysis of the trial court's ruling was based on our independent review of the Minute Order.

*6. Remand*

Based on the trial court's failure to apply the proper standard of review one option would be for us to reverse and remand for the trial court to properly exercise its independent judgment. (E.g., *Fukuda, supra*, 20 Cal.4th at p. 825.) However, a proper application of the standard of review, i.e., according a strong presumption of correctness to the findings, leads to only one conclusion, i.e., Mercury did not meet its burden to prove the findings in the Commissioner's Decision were not supported by the evidence. As stated above, the court did not reject the evidence, nor did it contest the findings in the Commissioner's Decision. In addition, several of the issues presented were questions of

38

law, subject to our de novo review.  On that basis, it would be an "idle act" to remand for a new hearing.  (*Sager, supra*, 156 Cal.App.4th at p. 1061.)  Thus, we are reversing the judgment and directing the trial court to deny Mercury's petition and enter judgment in favor of appellants.  (*Ibid*.)

## DISPOSITION

The judgment is reversed and the writ of mandate is vacated.  The trial court is directed to deny the writ and enter judgment in favor of appellants.  The motion for judicial notice is granted; the motion to strike is denied.  Appellants are entitled to costs on appeal.


THOMPSON, J.

WE CONCUR:


IKOLA, ACTING P. J.


GOETHALS, J.