Filed 8/7/20; certifid for publication 9/1/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JUSTIN LAND, <br>   Plaintiff and Appellant, <br> v. <br> CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD et al., <br>   Defendants and Respondents. | A153959 <br><br> (Alameda County <br> Super. Ct. No. RGl6825540) |

Justin Land appeals from the denial of his petition for a writ of administrative mandamus (Code Civ. Proc., § 1094.5) challenging the denial of unemployment insurance benefits.  We reverse on the ground the California Unemployment Insurance Appeals Board (Appeals Board or Board) prejudicially abused its discretion in refusing to consider additional evidence proffered by Land.  We appreciate that the Appeals Board has considerable discretion in allowing or refusing to consider new evidence.  However, given the particular circumstances here, we conclude the proffered evidence should have been accepted and considered.

## BACKGROUND

For a little over 10 years, Land worked as a field service specialist for DISH Network LLC (Dish).

On June 17, 2015, Dish received a customer complaint that Land had "failed to complete his work" (the Cotati complaint).  The customer reported

that in the middle of the service call, Land informed her "he would return the following day but [he] never came back or called to follow up." A review of the log for Land's service van confirmed that he left the job site for approximately 40 minutes while he was still "clocked into the job."

When Dish personnel interviewed Land about the complaint, he admitted leaving the job site to go to the bank during a download. He also admitted he had "promised that he would return the following day to fix the issue." He further admitted he had failed to return, claiming he simply "forgot to call the customer." He also confirmed that at no time did he call for help or contact Dish management for assistance.

Land's supervisor filled out an "Employee Consultation" form, stating Land had "been advised in New Hire Orientation, in FSS training and during All Team Meetings that [technicians] must always clock in and out accurately and they must always status themselves accurately." Additionally, he had been part of discussions "with the team that, other than meal and rest breaks, they are to clock in and out from the phone banks in the office." Land's supervisor also noted the Dish employee handbook included examples of unacceptable conduct, including the following: " 'Falsification of Company records—e.g., omitting facts or giving wrong or misleading information' and 'Violation of or failure to adhere to any DISH procedure, rule, regulation, system, standard or guideline whether in this Handbook, posted or communicated in training materials, verbally, in memo form or observed in practice.' "

The consultation form, dated June 23, also stated it was a "Final written notice" issued "due to policy violation: Falsification of Company records—giving wrong or misleading information. Failure to adhere to company policies." It additionally warned, "Any further incidences may lead

2

to further disciplinary action, up to and including termination."  Land signed the form on June 29 and did not provide any comments in the space provided for employee comments.

On June 28, the day before Land signed the consultation form pertaining to the Cotati complaint, Dish received another customer complaint (the Santa Rosa complaint).  The customer reported that Land had come to her house on his day off with his "school age daughters" to fix a problem with her Internet.  The customer claimed she was now "missing items from her home and believe[d] one of [Land's] children took the missing items."

A regional manager and human resources adviser interviewed Land about this complaint on July 2 and completed another employee consultation form, dated July 9, documenting Land's responses.  Land admitted "going to the customer's home off the clock and taking his daughters."  The consultation form also noted Land had completed a training course on June 14, which had "provided [him] with clear guidance on company expectations concerning ethical behavior and appropriate customer interaction."  Additionally, "[t]hroughout his tenure," Land had "received training and reminders that he cannot provide any service work to a customer off the clock and without a valid work order," and that he "cannot provide his personal contact information."  This consultation form, as had the prior consultation form, also cited to the employee handbook.  Land signed the consultation form and once again did not provide any comments in the space provided for employee comments.

The July 9 consultation form also stated it was serving as "a termination notice" due "to the severity of the issues" and specifically, "due to policy violation: Falsification of Company records—giving wrong or misleading information [and] Failure to adhere to company policies."

3

Land subsequently applied for unemployment benefits.

As is statutorily required, the Employment Development Department (EDD) notified Dish. Dish responded that Land had been "discharged for violation of a company policy," but provided no other information.

In an interview with the EDD, memorialized in its "Record of Claim Status Interview Misconduct" setting forth the "summary of material facts and reason for [its] decision," Land admitted he had failed to finish the Cotati job. He told the EDD he "basically left b/c lady was being rude and wanted it done b/c she wanted to leave." Land also acknowledged that he had told the customer he would return the next day to finish, but again said he "just forgot to go back the following day." He further admitted that as a result, he had been "suspended and written up." He stated he was discharged after giving out his personal number to the Santa Rosa customer, returning to the customer's home while off duty with his children, and failing to let Dish know when the customer later called him complaining about missing items she suspected his children had taken. Land maintained he was not aware of any company policy regarding giving out personal numbers, stating "every tech gives out their ph#'s to avoid trouble calls."

The EDD determined Land was ineligible for unemployment benefits under Unemployment Insurance Code[1] section 1256 because he had been discharged for breaking "a reasonable employer rule." Land knew or should have known that his actions could result in termination because of the final written notice he had received at the "end of June due to customer complaint re failure to finish job." The EDD concluded Land's actions were "a substantial breach of material duty to follow a policy which should have been

_____

[1] All further statutory references are to the Unemployment Insurance Code unless otherwise indicated.

4

known and therefore willful," and his actions "injured the employer's interest by making co[mpany] potentially liable."

Land, in propria persona, filed an "Appeal Form." He maintained he was unaware of any Dish policy forbidding employees from giving out their personal contact information to customers and from performing work during off hours, and asserted Dish had never "taught [this policy] in training." He claimed he had gone back to the Santa Rosa customer's house "to prevent a trouble call (R12) and to save the company money for a truck roll," and that he would not have done so had he been "aware of these policies."

The "Notice of Hearing" before an administrative law judge (ALJ) instructed Land to "Bring all documents and witnesses necessary to support your case." It further stated, "**Evidence is rarely accepted after the hearing**."

At the hearing, the ALJ first went over several documents in the file, including the record of the claim status interview, the determination/ruling notice, and Land's appeal letter. The ALJ asked Land if he had had "an opportunity to review the papers" and if they could be entered "into the record." Land replied, "Yeah."

The ALJ next had Dennis McGowan, Dish's operations manager, testify. The ALJ asked McGowan to "[i]nclude dates if you would." McGowan stated Dish had received a complaint from a customer that Land had gone to the customer's home while "off-the-clock on his own time to do work" with his children (the Santa Rosa complaint). The customer claimed items were "missing from her house." The ALJ asked McGowan what time Land had gone to the customer's house. McGowan was not sure. The ALJ then asked, "But it was on June 28?" McGowan replied, "Yeah." Land did not object or correct the ALJ or McGowan.

5

McGowan further stated that prior to that incident, Dish had "retraining on we only go to customers' homes with appointments." McGowan also stated, "[W]e're not supposed to give out our own personal phone number." He then stated that on June 8, Land had "signed off" on a "training" "about pride and professionalism," and part of that training "was making sure you're clocked in. That we don't give out our personal phone numbers because that's there to protect" the employees. McGowan had spoken to Land after the Santa Rosa incident, and Land had said he had gone back to the house because he did not "want to get hit for what we call an R-12, meaning a trouble call." Technicians "get incentives by making sure that we don't go back after 12 days," "[s]o he was giving out his number so he could kind of protect his bonus." Additionally, McGowan stated technicians are provided with "their own company phone that they're supposed to use."

The ALJ asked McGowan if Land had been written up for "this or similar [¶] . . . [¶] . . . transgressions in the past," and McGowan replied Land had been "written up for not being clocked into a job that he was supposed to be at" the week before, "on June 23rd" (the Cotati complaint). McGowan explained Land left the job site "to go to the bank and he was written up for violating the policy of not clocking out of that customer, putting in a different scheduled event." The customer had "called and complained that he told the customer he would go back the next day and he did not and we weren't aware of that until the customer called." McGowan had spoken to Land about this incident as well, and learned there had been no "work order set up for the next day" and Land "was going back on his own time." Land had told McGowan he "was frustrated with that customer and he just wanted to, you know, get out of there."

6

The ALJ then entered into evidence the roster log for training and the two employee consultation forms Land had signed. Before doing so, the ALJ asked Land if he had had the opportunity to review the documents and if they could be entered into evidence. Land replied, "That's fine. Yes."

Before Land testified, the ALJ asked him if he had any questions for McGowan. Land only sought to clarify that he was working on the day of the June training.

Land then testified. As to the "failure to log out" during the Cotati service call, Land stated he was at the customer's house for a reoccurring problem, and it had been "a stressful day." According to Land, "a lot times [technicians] don't log out. We take a . . . 15-minute break if we're stressed." At the time, he had wanted a drink, but did not have any money. Since he had started a software download, which would take "up to an hour," he left the site and went to the bank, which "took a little longer than I thought, so it went over my 15-minute break." Land returned to the job but noticed "some more problems reoccurring," so he told the customer he would return the next day. But the following day, it "completely slipped [his] mind" to return. He claimed he did not give the customer his personal number, but agreed he "usually" did with some customers. He asserted "a lot of the technicians, we give out our personal numbers to avoid these R-12 trouble calls." He admittedly did not inform Dish he had "left the job undone" and that he was supposed to return the following day.

The ALJ next asked about the "June 28th job. That's the job in which the employer testified that it was notified that you returned on your off-the-clock with your children" (i.e., the Santa Rosa service call). Land did not object to or attempt to correct the date referenced by the ALJ. Rather, he replied, "Yeah." He then admitted he had given the customer his personal

7

phone number, but claimed he did so as a "good-faith judgment" to "try to build a relationship with our customers." The customer had called while he was out with his family on his day off, and she was having problems with her Internet. Land returned to the customer's house and went in, taking his two daughters with him. The customer gave the girls cookies and allowed them to "play in her bedroom." He fixed the ethernet cable, "a quick fix," and was in the house for about "5, 10 minutes." A week or so later, according to Land, the customer called him stating she "was missing . . . something from her house" and "accused" his children of stealing. Land maintained he had only returned to the customer's house, while off duty, "on a good-faith judgment." However, he admitted he would have "been dinged on [his] work performance" if the customer had called Dish about the Internet problems. He claimed he was not aware of any policy regarding giving out personal phone numbers. Although he acknowledged he "probably did" a "June 14th" training, he claimed "those things, usually we just—some of 'em we just kind of whip through it."

During the hearing, a friend of Land's godmother appeared to "support" Land. On inquiry by the ALJ, the woman acknowledged she had never met Land and had no personal knowledge about the events in question. The ALJ ruled she would not be testifying, stating she had no "firsthand percipient information regarding the issues."

After taking the matter under advisement, the ALJ issued a three-page ruling which included sections entitled "Issue Statement," "Findings of Fact," "Reasons For Decision," and "Decision." The ALJ upheld the EDD's denial of unemployment benefits because Land had been discharged for misconduct.[2]

---

[2] We discuss the ALJ's findings of fact and reasons for decision in more detail, *infra.*

Land, still in propria persona, appealed to the Appeals Board. The Board sent him an acknowledgement letter stating, among other things, that any request to present new or additional evidence had to be accompanied with an explanation as to "why it was not given to the [ALJ] at the hearing, and why it is important to the case."

Land then submitted a declaration from the Santa Rosa customer to "correct" a factual mistake in the ALJ's decision which he claimed erroneously stated the " 'Triggering Event' leading to claimant's termination was mistakenly identified as taking place on June 28th and June 29th, 2015." The customer declared she did not know the exact date of the service call, but she "believe[d] it to be right after the Memorial Day holiday," on that Monday or Tuesday, with a return call on Wednesday. She did not make a complaint to Dish, however, until "June of 2015, approximately three to four weeks after the May 2015 installation date." Land explained that it was not until he reviewed the ALJ's decision that he "realized that certain factual chronological information" recited "as the basis for the finding of misconduct was incorrect."

The Appeals Board forwarded the declaration to Dish, informing it that it could not "submit a response to the enclosed material at this time." The Board further advised that if the declaration contained "new or additional evidence," the Board would not consider it "unless there [was] good reason why it was not presented" to the ALJ, and if the Board did consider the evidence, Dish would then be given an opportunity to respond. The Board ultimately refused to consider the declaration.

After reviewing the record, the Appeals Board adopted as its own the ALJ's findings of fact, supplemented with one additional finding by the

Board.  The Board also adopted the ALJ's reasons for decision, with one modification consisting of a revised final paragraph.[3]

Land retained counsel and eventually filed a first amended petition for writ of administrative mandamus to compel the Appeals Board and EDD to set aside the denial of benefits.[4]

Land claimed the Dish policy he assertedly violated by providing his personal number to a customer and performing work off-duty was "unknown" to him and not set forth in "any writing."  And, "[e]ven assuming the alleged policy existed" and provided a sufficient basis for termination, his violation was insufficient to "constitute the judicially mandated degree and nature of 'misconduct' that would justify denying" his unemployment insurance

---

[3] We also discuss the Appeals Board's decision in further detail, *infra*.

[4] In his original writ petition, Land did not name Dish as a real party in interest.  In his amended petition, Land "added" Dish as a real party in interest, and at that point, the Appeals Board and EDD demurred on the ground Dish was an indispensable party but could not be joined because the statute of limitations had run.  Before the trial court could rule, Dish filed its own a notice of "joinder," and then moved for judgment on the pleadings on the ground it was an indispensable party but had not been named in the original petition and the statute of limitations had run.  It further asserted that if the court found it to be an indispensable party, the court should dismiss the entire writ proceeding.  The Appeals Board and the EDD demurred again on the same ground.  Land filed opposition, and after a hearing, the court granted Dish's motion for judgment on the pleadings but overruled the Board and EDD's demurrer.  Accordingly, Dish is not a party to this appeal.  Even though Land prevailed on the indispensable party issue, he briefed the issue in his opening brief, anticipating the Appeals Board and EDD would raise the issue.  However, they chose not to do so, asserting the issue is "moot."  Land nevertheless claims the issue is not moot because "the ruling creates issue preclusion on the recurring issue" and asks that we address the issue.  We decline to do so.  (See *City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 70 ["Courts are not free to render advisory opinions regarding controversies which the parties fear will arise, but which do not presently exist."].)

benefits because he "acted reasonably in the good faith exercise of judgment" in providing his personal number to a customer.

He also maintained the ALJ's findings were "mistaken" as to the sequence of events and the Appeals Board's findings were "incorrect" in that the policy he purportedly violated was not written and he had no other prior policy violations. He further maintained the Board had improperly "refused to consider" the customer declaration that assertedly showed the ALJ's findings were based on a "mistake" as to the factual chronology. As to why he had not presented this declaration earlier, Land stated he was not represented by counsel at the administrative hearing and "[h]e could not reasonably be required to anticipate that the ALJ would fail to comprehend" the correct timeline of events. Finally, he asserted Dish had failed to provide the EDD with "facts sufficient to overcome the presumption in section 1256 that he was terminated for reasons other than misconduct." He claimed he was "entitled to the statutory presumption" and the EDD had "erroneously denied benefits based solely on [his] statement."

In support, Land submitted a declaration by his attorney stating the Santa Rosa incident occurred in May 2015 and Dish did not respond to discovery requests (after it had been dismissed from the mandamus proceeding). Counsel further opined as to standard industry practices in the cable technician industry. Land did not offer any explanation as to why this information had not, or could not, have been presented earlier. The Appeals Board and EDD objected to the declaration.

The Appeals Board and EDD also opposed issuance of a writ. They claimed Land had properly been denied unemployment insurance benefits because he had been discharged for misconduct. In particular, Land "engaged in unethical, financially self-interested misconduct which:

11

(1) sought to improperly boost his paycheck," by "running personal errands 'on the clock,' and performing off-the-books work to improperly maintain a bonus"; "(2) significantly harmed DISH's customer relations"; and "(3) exposed DISH to legal liability that it should never have been exposed to." Furthermore, Land "knew—or should have known—that his actions violated company policy" because he had participated in a June training, "which discussed the importance of not giving out personal telephone numbers, doing off-the-clock work, or clocking out of a job improperly."[5] And, after the June 23 incident, Land's supervisor had "emphasized to [Land] that he had to 'make sure that you're clocked in when you're supposed to be' and that he could not return to job sites unless formal works [*sic*] orders had been entered." Land had also " 'received training and reminders that he cannot provide his personal contact information to customers,' " and " 'throughout his tenure with Dish, [Land] has received training and reminders that he cannot provide any service to a customer off the clock and without a valid work order.' " Finally, the Appeals Board and EDD noted Dish "*did* submit a letter to [the EDD] within the required timeframe," and in any case, Land's own testimony, "rebutted section 1256's presumption that he was not discharged for misconduct" by admitting to the misconduct.

The trial court issued a tentative decision denying Land's writ petition, which Land contested.

On the morning of the hearing, Land submitted a third declaration, this one self-authored, stating the Santa Rosa incident occurred in May, not in June, Dish had no written policies about not giving out personal phone

---

[5] The Appeals Board and the EDD acknowledged that although Land's former supervisor testified the training was on June 8, the second "Employee Consultation"/termination notice stated it was June 14. The training sign-in sheet, itself, specifies the "Date Range" was June 8–12.

12

numbers, the Santa Rosa customer found the missing items from her home, and the Cotati incident occurred on June 8, prior to a training that occurred on June 14.

Stating it was "not sure I'm going to even consider it at all," the court called for argument by counsel.

Land's attorney took issue with the trial court's "reliance" on the paragraph of the ALJ's decision modified by the Appeals Board, claiming the court's job was to "focus on whether the findings of the administrative agency that you're reviewing are supported.  And so it's important that you address the correct findings, not when—that the ALJ made that was deleted but the actual finding of the Board."  Next, counsel asserted there was no written policy regarding working off the clock, but maintained "to the extent it was an oral policy, what [Dish] meant was side jobs; in other words, you don't use your skill as a technician to do a job that you're paid for or maybe you're not paid for, but it otherwise would be available . . . ."  At this point, the court asked, "So you're saying the company said it was okay to go places on your own time, bring your children.  Wouldn't there be liability issues potentially?  You don't have a—it sounds like an incredibly bad business practice."  Counsel responded, "Well, no.  It's actually good customer service to allow the tech to make a minor adjustment," but that the customer called when Land was with his children and told him it was okay to bring them.  The court noted, "It's not up to her.  [H]e's the employee, and he knows his company wants him to work on the clock for so many reasons.  One, that they get paid more.  Two, . . . that they track what's going on. . . . There are certain liability questions if someone was injured or if property was stolen.  I mean, there's all kinds of reasons why that makes good business sense."

Finally, counsel took issue with the Appeals Board's characterization of Land's conduct—as "not simply an error in judgment, but a willful or wanton, substantial breach of his duty to the employer, tending to injure the employer" —pointing to the "fundamental humanitarian policy" underlying the unemployment benefit statutes. Thus, even if his conduct had justified termination, it did not "constitute the degree of misconduct" necessary for denial of unemployment benefits. When the court observed there had been more than one incident, counsel maintained that even considered together, the two incidents "were a relatively short period of time when he was going through a difficult time." Counsel further asserted both incidents actually occurred prior to the "June 14th training," and it was the complaints that were made thereafter.

Counsel for the Appeals Board and the EDD, in turn, objected to Land's belated declaration, pointing out the record was "limited to the records below and extraordinary circumstances to justify departing [from] that. They have had a year and a half since they filed the case." Counsel further argued the Board's decision was supported by sufficient evidence.

The court took the matter under submission, and later in the day adopted its tentative ruling as its final decision and denied Land's writ petition.[6]

## DISCUSSION

### A. *Applicable Standards of Review*

#### *Trial Court's Review in Administrative Mandamus*

The parties do not dispute that the trial court was called on in this case to exercise its "independent judgment" in reviewing the administrative

---

[6] We discuss the trial court's order in more detail, *infra.*

record.  (*Paratransit Inc. v. Unemployment Ins. Appeals Bd.* (2014) 59 Cal.4th 551, 562 (*Paratransit*).)

In *Fukuda v. City of Angels* (1999) 20 Cal.4th 805 (*Fukuda*), our Supreme Court explained that, "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence."  (*Id.* at p. 817; *Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 774–776, 780–781.)  "[T]he presumption provides the trial court with a starting point for review—but it is only a presumption, and may be overcome.  Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the agency's findings." (*Fukuda*, at p. 818.)  An "abuse of discretion [by the administrative agency] is established if the court determines that the findings are not supported by the weight of the evidence."  (Code Civ. Proc., § 1094.5, subd. (c).)

Thus, "under the independent judgment standard, 'the trial court begins its review with a presumption that the administrative findings are correct, [but] does not defer to the fact finder below and accept its findings whenever substantial evidence supports them.  Instead, [the court] must weigh all the evidence for itself and make its own decision about which party's position is supported by a preponderance.  [Citation.]  The question is not whether any rational fact finder could make the finding below, but whether the reviewing court believed the finding was actually correct.' " (*Coastal Environmental Rights Foundation v. California Regional Water Quality Control Bd.* (2017) 12 Cal.App.5th 178, 188 (*Coastal Environmental*).)

***Standard of Review on Appeal***

In reviewing a trial court's judgment in a mandamus proceeding wherein the lower court has exercised independent review, "an appellate court determines whether the independent 'findings and judgment of the [trial] court are supported by substantial, credible and competent evidence' in the administrative record. [Citations.] '[A]ll conflicts must be resolved in favor of the respondent and all legitimate and reasonable inferences made to uphold the superior court's findings; moreover, when two or more inferences can be reasonably deduced from the facts, the appellate court may not substitute its deductions for those of the superior court.' " (*Paratransit*, *supra*, 59 Cal.4th at p. 562.)

"However, the appellate court may disregard the superior court's conclusions when the probative facts are undisputed and clearly require different conclusions. [Citations.] ' "Appellate review in such a case is based not upon the substantial evidence rule, but upon the independent judgment rule." ' " (*Paratransit*, *supra*, 59 Cal.4th at p. 562; accord, *Moustafa v. Board of Registered Nursing* (2018) 29 Cal.App.5th 1119, 1129 [where the underlying conduct that gave rise to convictions was undisputed, whether criminal convictions could support disciplinary action presented question of law]; *City of Pleasanton v. Board of Administration* (2012) 211 Cal.App.4th 522, 537 [where probative facts were undisputed, whether petitioner was entitled to additional retirement benefits predominantly involved questions of law and appellate court would review those issues "without deference to the trial court's findings and conclusions"].)

Likewise, whether the trial court applied the correct standard in reviewing the administrative record is a question of law, which we review de novo. (*Coastal Environmental, supra,* 12 Cal.App.5th at pp. 187–188.)

16

**B.** *The Trial Court's Reference to the ALJ's "Reasons for Decision," Rather Than to the Appeals Board's Modification Thereof*

We first address Land's assertion that the trial court reviewed the "wrong" findings, i.e., those made by the ALJ rather than by the Appeals Board, and therefore committed legal error. We treat this as a claim the trial court erred in bringing to bear its independent judgment and therefore review the issue de novo.

Land is correct that the agency decision subject to review by way of administrative mandamus is the decision of the Appeals Board, and not the decision of the ALJ. (§ 410.)

What Land overlooks, however, is that the Appeals Board found each of the ALJ's "Findings of Fact"—that is, its findings as to the operative facts— did not go against the weight of the evidence and ruled they would stand and "not be disturbed on appeal." Thus, the Appeals Board adopted as its own the following findings of fact made by the ALJ:

> The claimant conducted a service call on June 28, 2015. Prior to leaving the service call, the claimant provided the customer with his private telephone number. Later he was summoned by that same customer to correct an installation defect of the communication equipment that the claimant installed the previous day. The claimant returned to the customer's home the following day, the claimant's day off, and performed this work.
>
> Performance of work 'off the clock' is a violation of company policy. Employees are rewarded for installations which do not require an R-12 or do-over for installation repairs which were not incorrectly performed initially. The claimant's return to the customer's home 'off-the-clock' spared the claimant an R-12 which would work as a demerit against future reward bonuses. Claimant was

17

aware of this policy at the time the return [*sic*] to the customer's home on June 29th.

The claimant was on final warning at the time of the dismissal incident. On June 23, 2015, the employer issued an employee communication which included a reminder of the claimant's obligation to adhere to the standards and rules as set forth in the employee handbook. Claimant was also admonished that this was his final warning due to falsification of company records which occurred on June 17th.

The Appeals Board "supplemented" these findings with one additional finding:

"The employer became aware of the claimant's work off the clock because the customer complained that items were missing from her home after the claimant and his children were there. The claimant was or should have been aware of the employer's policies because they were written and he had participated in training about them."

The Board also adopted the ALJ's "Reasons for Decision," "modified" in one regard. This modification consisted of replacing "paragraph six" of the ALJ's enumerated reasons, which had stated as follows:

In the present case, the claimant intentionally violated an important duty and obligation to maintain accurate company records. The claimant's return to a customer's home for repair of a previous installation was done to subvert the employer's policy regarding R-12's or do-overs which would result in the claimant's loss of credit toward bonuses or other rewards or incentives for good job performance. Furthermore, the claimant was aware that he was on final written warning at the time of service call incident [*sic*]. The prior warning should have raised the claimant's awareness of the importance to adhere to company policy. The claimant is dismissed from his most recent employment for misconduct.

In its place, the Appeals Board stated:

In this case, the claimant failed to comply substantially with the directions of his employer concerning the service in which he was engaged by returning to the customer's home to work off the clock. His obedience was not impossible or unlawful and imposed no new or unreasonable burdens upon him. The claimant had received prior warnings for insubordination in the form of other policy violations. The final incident which resulted in his discharge interfered with the orderly conduct of the employer's business and threatened to injure the employer's interest in a consequential or substantial manner. Under these circumstances, the claimant's conduct was not simply an error in judgment, but a willful or wanton, substantial breach of his duty to the employer, tending to injure the employer. As such, the employer discharged the claimant for misconduct connected with his most recent work.[7]

The Appeals Board thus summarized the state of the case as follows: "[W]e adopt the [ALJ's] issue statement, the supplemented findings of fact and the modified reasons for decision as our own."[8]

Land is also correct that in its order denying his writ petition, the trial court cited to the sixth paragraph of the ALJ's "Reasons for Decision" and did not acknowledge or address the Appeals Board's modification of that

---

[7] We note the findings of fact and the pivotal reason for decision identify Land's violations of Dish's policy concerning off-the-clock work and not any policy, written or unwritten, about technicians providing customers with direct phone numbers.

[8] Although the paragraphs in the ALJ's decision are not numbered, at the hearing on Land's writ petition both parties identified the sixth paragraph of the ALJ's "Reasons for Decision" as the paragraph modified by the Appeals Board. And while the Board also, at one point, stated it was modifying the "findings of fact," it is apparent from the entirety of its decision the modification was to the ALJ's "Reasons for Decision," as the parties, themselves, acknowledged.

19

paragraph. And in some circumstances, such oversight by a trial court could require reversal and remand.

However, that is not the case here because nearly every one of the specific factual determinations referenced in the sixth paragraph of the ALJ's reasons for decision, and which the trial court identified in its denial order, were also set forth in the ALJ's "Findings of Fact," which the Appeals Board adopted as its own. These findings included the following: Land returned to the Santa Rosa customer's home " 'off the clock' [which was] a violation of company policy." Land was aware of this policy. The off-the-clock return spared Land "an R-12 which would work as a demerit against future reward bonuses." And Land was "on final warning" at the time of "the dismissal incident."

Thus, even if the trial court improperly cited to the sixth paragraph of the ALJ's "Reasons for Decision," rather than to the Appeals Board's modification of that paragraph, this error was not prejudicial, given the Board's express adoption of the factual findings the trial court identified as significant.

*Mercury Ins. Co. v. Lara* (2019) 35 Cal.App.5th 82 (*Mercury*), on which Land relies, is distinguishable. In that case, the trial court granted a writ of mandate against the state Insurance Commissioner. The Court of Appeal reversed, concluding the trial court had failed to recognize it was the "plaintiff's burden to show the findings in the Commissioner's Decision were not supported by the evidence" and had also failed to accord the commissioner's decision the presumption of correctness required by *Fukuda.* Indeed, the trial court "paid scant if any attention to the findings of the Commissioner's Decision or whether they were supported by the weight of the evidence." (*Mercury*, at p. 96.)

Here, in contrast, the trial court cited to *Fukuda*. Moreover, the Appeals Board adopted the ALJ's findings of fact, and it is these findings on which the trial court focused.

## C. *The Appeals Board's Refusal to Consider the Belated Declaration*

Land also asserts the Appeals Board "improperly refused to consider" the Santa Rosa customer's declaration which would have "effectively refuted the crucial finding that Land 'was on final warning at the time of the dismissal incident.' "

The Board refused to consider this declaration, stating: "The claimant has included new and additional evidence along with repeating substantially the same allegations made during the [ALJ] hearing. The additional evidence has not been considered in our deliberations, as it would be improper and would violate due process."

In an unemployment insurance benefits case, a party appearing before an ALJ "shall have his or her evidence and witnesses and be ready to proceed." (Cal. Code Regs., tit. 22, § 5062, subd. (a).) On appeal to the Appeals Board, "An application to present new or additional evidence shall state the nature of the evidence, the materiality of such evidence, and the reasons why such evidence was not introduced at the hearing before the [ALJ]. If the new or additional evidence is documentary in nature, the applicant shall attach the evidence to the application. No such evidence shall be considered by the board unless the board admits it." (*Id.*, § 5102, subd. (d).)

As part of his 10-page written submission to the Appeals Board, Land included the declaration from the Santa Rosa customer, which stated in pertinent part:

> I believe [the installation date] to be right after the
> Memorial Day holiday, Monday, May 25th or the following

21

day Tuesday May 26th, then a return visit Wednesday May 27th. It's possible that Mr. Land installed the service on Friday, May 29th with a return visit on Saturday, May 30th. . . .

[¶] . . . [¶]

I contacted [Dish] Human Resources Dept. in June of 2015, approximately three to four weeks after the May 2015 installation date. I spoke with a manager who referred me to Naomi in human resources. Naomi and I communicated on the phone and via email concerning Mr. Land's installation . . . at my home.

Land explained it was not until "review of the ALJ Decision [that he] realized that certain factual chronological information presented . . . was incorrect." He did not explain why, during the hearing, he had not disputed McGowan's testimony that the Santa Rosa incident occurred on June 28th or clarified the trial court's assumption, following that testimony, that the incident occurred on that date.

As Land points out, it is clear the date of the Santa Rosa incident was pivotal to the ALJ's decision. The ALJ viewed the incident as being the second time Land violated the company's no "off the clock" work policy and found he had done so to avoid an "R-12, which would work as a demerit against future reward bonuses." The ALJ also found Land was aware of "this policy," although he did not state whether this finding was based on McGowan's testimony about the mid-June training, or his testimony about other training, or the references in the "Employee Consultation" forms to training and to the employee handbook. The ALJ further found Land "was on final warning at the time of the dismissal incident," a finding based on the employee consultation form dated June 23 and issued in conjunction with the Cotati complaint (which complaint Dish had received on June 17). This "prior warning," said the ALJ, "should have raised [Land's] awareness of the

22

importance to adhere to company policy."  The ALJ therefore concluded, in its "Reasons for Decision," that Land had been dismissed "for misconduct."

Because the Appeals Board refused to consider the proffered declaration of the Santa Rosa customer, it accepted the factual scenario as found by the ALJ and, thus, decided Land's appeal based on this same supposed sequence of events.  The Board concluded, as stated in its modification to the ALJ's reasons for decisions, Land failed "to comply substantially with directions of his employer concerning the service . . . by returning to the customer's home to work off the clock."  Land "had received prior warnings for insubordination in the form of other policy violations.  The final incident which resulted in discharge interfered with the orderly conduct of the employer's business . . . ."  And Land's conduct "was not simply an error in judgment, but a willful or wanton, substantial breach of his duty to his employer."

While it is only in a very unusual case that we will conclude the Appeals Board abused its discretion in failing to consider new evidence, we so conclude in this case, since the date on which the Santa Rosa incident occurred, as opposed to the date Dish received the complaint from the customer, was pivotal to the ALJ's decision and to the Appeals Board's reasoning for upholding it.

The Appeals Board correctly points out Land did not explain to the Board why evidence as to the correct date on which the Santa Rosa incident occurred could not have been provided at the administrative hearing.  And certainly, Land could have disputed McGowan's testimony.  We observe, however, that the ALJ also had before him the employee consultation forms.  These forms clearly indicate the dates stated therein are the dates Dish *received* the customer complaints.  The forms do not specify, or reflect, the

dates of the service calls giving rise to the complaints. Therefore, the forms, themselves, raised some doubt as to McGowan's testimony that the Santa Rosa incident occurred on the date set forth in the employee consultation form prepared in connection with that incident.

In addition, while the Appeals Board concluded it would have "violate[d] due process" to allow the proffered declaration, that is hardly the case. The Board notified Dish of the declaration and told it that if the Board chose to consider it, Dish would have an opportunity to respond. Accordingly, Dish would have been accorded ample due process.

The Board makes no claim that responding to the declaration, by either confirming or disputing the actual date of the service call, would have been unduly burdensome on Dish. Indeed, we cannot imagine that this information would not have been readily available to Dish.

Finally, we are cognizant of the " ' "humanitarian purpose of the unemployment compensation statutes." ' " (*Paratransit, supra,* 59 Cal.4th at p. 566.)

We therefore conclude that, in this case, the need for accuracy as to the chronology of the events in determining Land's eligibility for unemployment insurance benefits outweighs the deficiencies in his proffer of new evidence to the Appeals Board. We further conclude, given the potential significance of this new evidence, the Board's refusal to consider it constituted a prejudicial abuse of discretion, requiring reversal of the trial court's denial of Land's writ petition with directions to grant the petition and remand the matter to the Appeals Board to either (a) accept and consider the declaration of the Santa Rosa customer and allow Dish to present further evidence as to the date of that service call, and in light of such evidence, to reconsider its decision; or (b) remand the matter to the ALJ to accept and consider the declaration of

24

the Santa Rosa customer and allow Dish to present further evidence as to the date of that service call, and in light of such evidence, to make new findings of fact and reasons for decision. (See *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 527 (*Voices of the Wetlands*), quoting *Keeler v. Superior Court* (1956) 46 Cal.2d 596, 600 ["there is 'no question' of a court's power . . . [citation] to remand, prior to a final mandamus judgment, for further necessary and appropriate agency proceedings; 'aside from' court's power under [Code Civ. Proc.,] § 1094.5 to enter judgment remanding for consideration of evidence not available, or improperly excluded, in original agency proceeding, 'such a power to remand' prior to judgment 'also exists under the inherent powers of the court' "].)[9]

We therefore need not, and do not, consider Land's claim that the trial court erred in refusing to consider the two additional declarations he offered during the mandamus proceedings.

We likewise do not consider Land's additional claim that the findings of fact (those made by the ALJ and adopted by the Appeals Board, as well as the Board's own supplemental finding) do not, as a matter of law, support a denial of unemployment benefits under the controlling legal standard as explicated in *Paratransit, supra,* 59 Cal.4th at pages 562–565. The findings of fact made following issuance of a writ of mandate and further

_____

[9] "[S]ubdivision (f) of [Code of Civil Procedure] section 1094.5 provides that, when granting mandamus relief, the court may 'order the reconsideration of the case *in the light of the court's opinion and judgment.*' (Italics added.) This clearly implies that, in the final judgment itself, the court may direct the agency's attention to specific portions of its decision that need attention, and need not necessarily require the agency to reconsider, de novo, the entirety of its prior action." (*Voices of the Wetlands*, *supra,* 52 Cal.4th at p. 528.)

administrative proceedings may, or may not, result in a different decision as to Land's eligibility for unemployment insurance benefits.

## DISPOSITION

The trial court judgment is reversed with directions to grant Land's writ petition and issue an appropriate writ of mandate directing the Appeals Board to either (a) accept and consider the declaration of the Santa Rosa customer and allow Dish to present further evidence as to the date of that service call, and in light of such evidence, to reconsider its decision; or (b) remand the matter to the ALJ to accept and consider the declaration of the Santa Rosa customer and allow Dish to present further evidence as to the date of that service call, and in light of such evidence, to make new findings of fact and reasons for decision.  Appellant is awarded costs on appeal.

                                        _____

                                        Banke, J.

We concur:


_____
Margulies, Acting P.J.


_____
Sanchez, J.


A153959, Land v. California Unemployment Insurance

27

Filed 9/1/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JUSTIN LAND,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CALIFORNIA UNEMPLOYMENT<br>INSURANCE APPEALS BOARD et al.,<br><br>    Defendants and Respondents. | A153959<br><br>(Alameda County<br>Super. Ct. No. RGl6825540)<br><br>ORDER CERTIFYING OPINION FOR<br>PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter, filed on August 7, 2020, was not certified for publication in the Official Reports. After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

Dated: _____

                        Margulies, Acting      P. J.

1

Trial Court: Alameda County Superior Court

Trial Judge:    Hon. Kimberly E. Colwell

Counsel:

Garfinkle Law Office, Gary S. Garfinkle and Maria J. Garfinkle, for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Susan M. Carson, Dane C. Barca and Nimrod P. Elias, Deputy Attorneys General, for Defendants and Respondents.

2